**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL GAFFNEY,<br><br>            Plaintiff,<br><br>      v.<br><br>MUHAMMAD ALI ENTERPRISES LLC, a New York Limited Liability Company; AUTHENTIC BRANDS GROUP LLC, a New York Limited Liability Company; ROOTS OF, INC., a California corporation d/b/a "ROOTS OF FIGHT;" and DOES 1-10,<br><br>            Defendants. | Civil Action No. 1:18-CV-08770 (GBD)<br><br>Civil Action No. 1:20-CV-07113 (GBD)<br><br>**PLAINTIFF MICHAEL GAFFNEY'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUMMARY ADJUDICATION** |

**LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS**

1. Michael Gaffney began his career as a news photographer in 1972. [Declaration of Michael Gaffney ("Gaffney Decl."), ¶ 2]

2. In August of 1977, he traveled to Muhammad Ali's boxing camp in Deer Lake, Pennsylvania, in an attempt to photograph the then-heavyweight champion. [M. Gaffney Dep. Tr. at 32:23-34:23]

3. At the time, Ali was one of the most famous people in the world, having already fought *The Rumble in the Jungle* against George Foreman and the *Thrilla in Manila* against Joe Frazier. [Gaffney Decl., ¶ 4]

4. Gaffney had no appointment to meet Ali and didn't even know if he would make it into the camp. [M. Gaffney Dep. Tr. at 32:23-34:23]

5. Gaffney was able to obtain access to Ali's camp and began photographing him. [M. Gaffney Dep. Tr. at 32:23-34:23]

6. Gaffney particularly impressed Ali by joining him on a pre-dawn run up a mountain outside of the camp. [Gaffney Decl., ¶ 6]

7. After a few days at camp, Gaffney told Ali that he planned to leave soon, to get back to his family and his job at a newspaper in Morristown, New Jersey. [M. Gaffney Dep. Tr. at 32:23-34:23]

8. As it turned out, Ali's longtime personal photographer, Howard Bingham, was planning to run for Congress. [M. Gaffney Dep. Tr. at 32:23-34:23]

9. Needing a photographer, Ali invited Gaffney to join him over the following year as he traveled the world and fought in three championship bouts. [M. Gaffney Dep. Tr. at 32:23-34:23]

10. During that time, Ali defended his titles against Earnie Shavers at Madison Square Garden, lost a shocking upset to Leon Spinks in Las Vegas, and then reclaimed the heavyweight title for an unprecedented third time from Spinks in New Orleans. [Gaffney Decl., ¶ 9]

11. Over his year with Ali, Gaffney captured over 8,000 photographs, not only of Ali in the gym or the ring, but also during private moments with family and friends, and during a visit to a hospital for children with polio in Bogota, Colombia. [Gaffney Decl., ¶ 10]

12. Gaffney is the sole copyright author and owner of the photographs that he took during his time with Ali. [Gaffney Decl., ¶ 11]

13. On February 1, 2011, Gaffney entered into a license agreement with Defendant Muhammad Ali Enterprises, LLC, the company that marketed and licensed Ali's image and likeness (the "Agreement"). [Declaration of Robert E. Allen ("Allen Decl."), ¶ 9, Ex. 9]

14. The term of the Agreement expired on January 31, 2015 (the "Term"). [Allen Decl., Ex. 9]

15. MAE had an option to extend the Agreement for an additional term of five years upon the written consent of Gaffney, which could be withheld in his sole discretion. [Allen Decl., Ex. 9]

16. Indeed, Gaffney declined to extend the Agreement and it did, in fact, expire on January 31, 2015. [Dkt. No. 59 at Ex. G, '770 Case (March 4, 2015 Email from Michael Gaffney to Jasen Wright)]

17. In the Agreement, Gaffney granted MAE, during the Term and subject to certain terms and conditions, an exclusive license to "use or license to selected third parties the Photographs on or in connection with the manufacture, sale, marketing and distribution of items

of merchandise associated with Muhammad Ali and/or an advertisement which features an endorsement of a good or service by Ali" and to "use or license the Photographs for 'Promotional and Marketing Purposes.'" [Allen Decl., Ex. 9]

18.     "Promotional and Marketing Purposes" was defined as the use "of Photographs in connection with the marketing, promotion and advertising of MAE, Muhammad Ali, as well as for MAE's future displays, trade shows, and exhibits, and for display within any third party brick and mortar retail store that feature Muhammad Ali licensed products or any Muhammad Ali themed real estate projects, such as a display in restaurants and/or hotels, in any and all forms of media now existing or hereafter developed." [Allen Decl., Ex. 9]

19.     Gaffney also granted MAE under the Agreement a non-exclusive license to "use or license to selected third parties the Photographs for 'Editorial Purposes,'" with "Editorial Purposes" defined as "the use of Photographs in connection with news programming, documentaries, magazines, books, newspapers, online counterparts of the foregoing, all of which must be primarily editorial in nature." [Allen Decl., Ex. 9]

20.     One of the terms of the Agreement was that MAE was required to obtain Gaffney's approval rights prior to MAE's exploitation of the Photographs. Under paragraph 1.2 of the Agreement, "[n]otwithstanding anything to the contrary contained herein, … [a]ll uses of the Photographs by MAE for the uses described in Paragraph 1.1.1 [i.e., merchandising and advertising] shall be approved by Photographer prior to their use, said approval not to be unreasonably withheld." [Allen Decl., Ex. 9]

21.     Despite MAE's obligation to seek Gaffney's prior written consent for merchandising and advertising, MAE only did so twice. [Allen Decl., Ex. 12]

22. The agreement further provided for Gaffney to be paid certain royalties for merchandising and advertising, but granted MAE "the right to use the Photographs for Promotional and Marketing Purposes for no charge." [Allen Decl., Ex. 9]

23. Another material term of the Agreement related to credit. The Agreement provided that "[a]ll use by MAE and all of MAE's licensees, of the Photographs shall contain the following legal notice (unless approved by Photographer in writing otherwise): **'Photographs © Michael Gaffney. All Rights Reserved.'**" (Bold emphasis in agreement.) [Allen Decl., Ex. 9]

24. MAE also agreed that "during this Agreement and thereafter it will not challenge or otherwise contest the title or any rights of Photographer in or to the Photographs or the validity of the license being granted." [Allen Decl., Ex. 9]

25. And finally, with respect to rights upon termination, the Agreement provided that "[n]otwithstanding anything to the contrary, upon any expiration or termination of this Agreement, MAE may continue to exercise the license rights granted to it in Paragraph 1.1 with respect to all licenses and/or agreements made prior to the date of termination, provided that the royalties with respect to such period are paid and the appropriate statements for that period are furnished to Photographer." [Allen Decl., Ex. 9]

26. In 2014, Defendant Authentic Brands Group, LLC, purchased MAE and sent Gaffney a letter dated January 24, 2014, confirming that ABG was successor-in-interest to MAE and notifying Gaffney that all future notices to MAE under the agreement should be sent to the care of ABG. [Allen Decl., Ex. 10]

27. ABG is an American brand development and licensing company based out of New York, New York with extensive experience in licensing and managing copyrights. [Dkt. No. 58 at ¶¶ 30-32, '770 Case; *see also* Dkt. No. 68 at ¶¶ 30-32]

28. ABG acquires, manages and builds long-term value in consumer brands on a worldwide basis by digital marketing and social media. [Dkt. No. 58 at ¶¶ 30-32, '770 Case; *see also* Dkt. No. 68 at ¶¶ 30-32]

29. ABG owns such consumer brands as Juicy Couture, Jones New York, Elvis Presley, Marilyn Monroe, Prince Tennis, Tapout, Hickey Freeman, Judith Leiber, Aeropostale, and others. [Dkt. No. 58 at ¶¶ 30-32, '770 Case; *see also* Dkt. No. 68 at ¶¶ 30-32]

30. On its website, ABG claims to own and have over 30 brands, 800 global partners, 6,000 stores, 270 million social media followers, and $15 billion in gross merchandise value. [Dkt. No. 58 at ¶¶ 30-32, '770 Case; *see also* Dkt. No. 68 at ¶¶ 30-32]

31. ABG's business model is to purchase brands in the sports, celebrity, men's fashion and women's fashion categories and license the intellectual property, including copyrights, to retailers, wholesalers, manufacturers, and direct-to-consumer channels worldwide for marketing and advertising. [Dkt. No. 58 at ¶¶ 30-32, '770 Case; *see also* Dkt. No. 68 at ¶¶ 30-32]

32. In a December 28, 2017, article in the *Robin Report*, ABG President and Chief Marketing Officer Nick Woodhouse described ABG's business and was quoted as saying: "Given the scope of the brand portfolio, harnessing digital intelligence and using it is increasingly an ABG competitive advantage. Our digital innovation group manages over 20 branded social media accounts in-house with a combined following of more than 211 million." [Dkt. No. 58 at ¶¶ 30-32, '770 Case; Dkt No. 59 at Ex. E; *see also* Dkt. No. 68 at ¶¶ 30-32]

33. Woodhouse further explained, "We are becoming a full-content machine with music, movies, television shows. We believe content is the biggest driver in brand development." [Dkt. No. 58 at ¶¶ 30-32, '770 Case; Dkt No. 59 at Ex. E; *see also* Dkt. No. 68 at ¶¶ 30-32]

34. In January 2015, as the expiration date of the agreement approached, Gaffney communicated with Jasen Wright, Vice President of Sports at ABG, by phone and email in an attempt to enter into a new agreement or extend the term of the existing one.

35. However, Gaffney and ABG failed to reach a new agreement, and Gaffney sent notice by email on March 4, 2015, to ABG that forbade any further use of his Photographs. [Dkt. No. 59 at Ex. G, '770 Case (March 4, 2015 Email from Michael Gaffney to Jasen Wright)]

36. Despite the license agreement having expired and Gaffney having given explicit notice to ABG that it no longer had any right to use his Photographs, ABG continued to copy and exploit the Photographs, in particular on the verified social media accounts that it manages on behalf of Ali. [Allen Decl., ¶¶ 2-3, 6, 8, Exs. 1, 2, 6, 8]

37. These verified accounts are massively popular, with the Facebook account having over 11 million likes, the Instagram account having over 4.6 million followers, and the Twitter account having over 800,000 followers, as of October 15, 2021. [Allen Decl., ¶ 13]

38. Indeed, shortly after Ali's death on June 3, 2016, Gaffney reached out to ABG and attempted to restart negotiations about a new deal. Again, the parties did not reach a new agreement, but it was clear during negotiations that ABG no longer had any right to use Gaffney's photographs and that the original agreement had expired in January 2015. [Allen Decl., ¶ 12, Ex. 12 (MG-MAEABG_000176 to '178)]

39. Nevertheless, ABG continued to post Gaffney's photographs on the verified social media accounts, all the way through 2018 and even into 2019. [Allen Decl., ¶¶ 2-3, 6, 8, Exs. 1, 2, 6, 8]

40. The photographs in the '770 case are covered by copyright registration numbers VAu 964-300, with an effective date of February 22, 2008, and TX 8-550-740, with an effective date of June 12, 2018. [Dkt. No. 59 at Ex. B, '770 Case (Copyright Registrations)]

41. Gaffney obtained expedited registration of the photographs at issue in the '113 case, which are covered by registration numbers VA 2-201-462, VA 2-201-463, and VA 2-201-464, each with an effective date of April 30, 2020. [Dkt. No. 1-1 at Ex. B, '113 Case (Copyright Registrations)]

42. Gaffney obtained copyright registration number VAu 964-300 on February 22, 2008 for a group of 15 unpublished photographs labeled Ali-001, Ali-002, Ali-003, Ali-004, Ali-005, Ali-006, Ali-007, Ali-009, Ali-010, Ali-011, Ali-012, Ali-013, Ali-015, Ali-016, and Ali-017. [Dkt. No. 59 at Ex. B, '770 Case (Copyright Registrations)]

43. Gaffney's copyright registration for his book, *The Champ: My Year with Muhammad Ali*, covers the remainder of the infringed photographs in the '770 case. This registration's number is TX 8-550-740 and its effective date is June 12, 2018. [Dkt. No. 59 at Ex. B, '770 Case (Copyright Registrations)]

44. For the three registrations at issue in the '113 case, two were obtained within five years of first publication (Reg. No. VA-2-201-462 for Ali-121 and Reg. No. VA 2-201-464 for Ali-109), but one was not (Reg. No. VA-201-463 for Ali-081). [Dkt. No. 1-1 at Ex. B, '113 Case (Copyright Registrations)]

45. Gaffney's photographs of Muhammad Ali were all taken in 1977 and 1978, as he traveled with Muhammad Ali. [Gaffney Decl., ¶ 12]

46. Gaffney is the sole author of each of the photographs at issue in these cases; he took each of them. [Gaffney Decl., ¶ 11]

47. Gaffney has not transferred ownership of the photographs. [Gaffney Decl., ¶ 13]

48. Gaffney was not on assignment for the *Daily Record* when he first visited Ali's training camp. [Gaffney Decl., ¶ 14]

49. Gaffney was not employed by Ali at the time that he took any of the photographs. [Gaffney Decl., ¶ 15]

50. Defendants produced a spreadsheet during discovery which lists the photograph, platform, post date, and takedown date for each of Defendants' social media posts that included a Gaffney photograph after the license term. [Allen Decl., ¶ 2, Ex. 1]

51. A copy of the spreadsheet as it was produced by Defendants is attached to the Declaration of Robert Allen as Exhibit 1, and a copy sorted by "Post Date" is attached as Exhibit 2. [Allen Decl., ¶¶ 2-3, Exs. 1-2]

52. Adam Kronengold, ABG's Chief Digital Officer and Defendants' 30(b)(6) designee, testified that the document is "a spreadsheet, links to social-media posts and when they were taken down, approximately." [Allen Decl., ¶ 6, Ex. 6 (A. Kronengold Dep. Tr. at 20:6-8)]

53. Defendants' infringement began with their posting of the Ali-081 photograph on Facebook, Instagram, and Twitter on March 4, 2015, and continued through April 30, 2019, with Ali-017—over six months after the filing of the '770 lawsuit. [Allen Decl., ¶¶ 2-3, Exs. 1-2]

54. In between, they posted the following Gaffney photographs, without authorization, to their verified social media accounts: Ali-002, Ali-006, Ali-008, Ali-017 Ali-105, Ali-029, Ali-030, Ali-044, Ali-053, Ali-060, Ali-077, Ali-081, Ali-095, Ali-102, Ali-109. [Allen Decl., ¶¶ 2-3, Exs. 1-2]

55. Defendants have also infringed Gaffney's copyrights in Ali-001, Ali-004, Ali-005, Ali-007, Ali-010, Ali-015, Ali-016, and Ali-018. [Allen Decl, ¶ 4, Exs. 3-4]

56. Each of these photographs was distributed by Defendants to one of their sublicensee partners after Gaffney's license with MAE had expired. [Allen Decl, ¶ 4, Exs. 3-4]

57. In fact, with respect to Ali-005, the infringement took place the *very next day*—on February 1, 2015, when Defendants distributed a copy of the photograph to one of their customers. [Allen Decl, ¶ 4, Exs. 3-4]

58. The remainder of these eight infringements also entailed distribution of a copy of one of Gaffney's photographs to a sublicensee partner after Gaffney's license had expired; sometimes they also included subsequent sales of products by these sublicensee partners. [Allen Decl, ¶ 4, Exs. 3-4]

59. Gaffney has prepared a chart, which is has attached as Exhibit 3 to the Allen Declaration, which cross references the photograph, the date of the infringement, and the evidence produced by Defendants which demonstrates that they continued to violate Gaffney's exclusive rights after the expiration of his license. [Allen Decl, ¶ 4, Ex. 3]

60. The photographs Ali-001, Ali-002, Ali-003, Ali-004, Ali-005, Ali-006, Ali-007, Ali-009, Ali-010, Ali-011, Ali-012, Ali-013, Ali-015, Ali-016, and Ali-017 were registered as an unpublished collection and granted an effective date of February 22, 2008. [Dkt. No. 59 at Ex. B, '770 Case (Copyright Registrations)]

61. Gaffney requested and had an oral agreement with the *Daily Record* that it would include a copyright notice along with the photographs of his that it published:

> Q. Okay. Were Ali 8 and Ali 14 first published with an acceptable copyright notice?
>
> A. By the Daily Record.
>
> Q. Is that a, "yes," or, "no"?

>    A. When I did that story with the Daily Record, I had requested -- I had an oral agreement that there would be a copyright notification on both of those pictures with --
>
>    (Simultaneous speaking.)
>
>    Q. My question is, were they first published with an acceptable copyright notice?
>
>    A. Well, there was a failure in the oral agreement that I had with the Daily Record and they published the pictures without a copyright notification on it.

[Allen Decl., ¶ 5, Ex. 5 (M. Gaffney Dep. Tr. at 79:24-80:16)]

62. Gaffney clearly testified during his deposition that the first time the photographs included in the '300 registration were exhibited was at the Morris Museum in February 2009. [Allen Decl., ¶ 5, Ex. 5 (M. Gaffney Dep. Tr. at 97:14-98:6)]

63. Gaffney produced an agreement with an entity called "Land of Legends," but the agreement with Land of Legends was "a fraudulent contract" and that "it was a fraudulent deal." [Allen Decl., ¶ 5, Ex. 5 (M. Gaffney Dep. Tr. at 123:13-124:2)]

64. Despite its obligation to preserve documents, after Gaffney filed and served the original complaint, ABG deleted all of its social media posts inclusive of the Photographs without taking a screenshot or otherwise preserving the information with respect to those posts (other than posts from 2014 that were later deleted). [Allen Decl., ¶ 6, Ex. 6 (A. Kronengold Dep. Tr. at 131:4-133:15)]

65. Defendants would download copies of the Photographs from a platform called Royalty Zone and then upload them to "scheduling platforms" that would post the photographs and accompanying captions on Defendants' social media accounts at a scheduled date and time. [Allen Decl., ¶ 7, Ex. 7 (K. Lewis Dep. Tr. at 21:17-20)]

| | |
|---|---|
| Date:  October 15, 2021 | Respectfully submitted,<br><br>    */s/ Thomas P. Burke Jr.*  <br>Robert E. Allen (admitted *pro hac vice*)<br>Thomas P. Burke Jr. (admitted *pro hac vice*)<br>GLASER WEIL FINK HOWARD AVCHEN &<br>  SHAPIRO LLP<br>10250 Constellation Blvd., 19th Fl.<br>Los Angeles, CA 90067<br>Telephone: (310) 282-6280<br>rallen@glaserweil.com<br>tburke@glaserweil.com<br><br>Jack Spinella<br>Spinella Law Group, LLC<br>425 Madison Avenue<br>New York, New York 10123<br>Telephone:  (908) 947-2336<br>jspinella@spinellalawgroup.com<br><br>*Attorneys for Plaintiff Michael Gaffney* |

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 15, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the parties through the Court's Electronic Case Filing System.

                                                                     */s/ Thomas P. Burke Jr.*
                                                                     Thomas P. Burke Jr.