**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL GAFFNEY,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>MUHAMMAD ALI ENTERPRISES LLC, a New York Limited Liability Company; AUTHENTIC BRANDS GROUP LLC, a New York Limited Liability Company; ROOTS OF, INC., a California corporation d/b/a "ROOTS OF FIGHT;" and DOES 1-10,<br><br>　　　　　　　　　　　　Defendants. | Civil Action No. 1:18-CV-08770 (GBD)<br><br>Civil Action No. 1:20-CV-07113 (GBD) |

**MEMORANDUM OF LAW IN OPPOSITION AND RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 3 REGARDING THE COMPETITIVE USE MULTIPLIER**

2371102.1

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................................... 1

    A. Introduction to Michael Gaffney ............................................................................... 1

    B. Gaffney's Commercial Exploitation of the Photographs ......................................... 2

    C. Gaffney's Relationship with Defendants .................................................................. 3

    D. Professor Jeffrey Sedlik's Experience and Qualifications ....................................... 4

    E. Professor Sedlik's Methodology in this Case ........................................................... 4

III. ARGUMENT ........................................................................................................................ 6

    A. The Competitive Use Multiplier Has Been Endorsed by Multiple Courts. ............. 6

    B. The Competitive Use Multiplier is Appropriate and Admissible Here. .................. 7

    C. Defendants' Remaining Complaints are Meritless. .................................................. 9

        1. Professor Sedlik Properly Relies on His Decades of Licensing Experience ........................................................................................................ 9

        2. It Is Entirely Proper to Provide a Range of Multiplier Values. .................. 11

IV. CONCLUSION ................................................................................................................... 12

i

**TABLE OF AUTHORITIES**

Page

*Conti v. Doe*,
  No. 17-CV-9268 (VEC), 2020 WL 6162104 (S.D.N.Y. Oct. 21, 2020) .................................. 10

*Devengoechea v. Bolivarian Republic of Venezuela*,
  No. 12-CV-23743-PCH, 2014 WL 12489848 (S.D. Fla. Apr. 25, 2014) ................................ 12

*D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*,
  561 F. Supp. 3d 114 (D.N.H. 2021) ............................................................................... 8, 9

*D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*,
  No. 17-CV-747-LM, 2020 WL 60351 (D.N.H. Jan. 6, 2020) ...................................................... 7

*Heller v. Shaw Indus., Inc.*,
  167 F.3d 146 (3d Cir. 1999) ........................................................................................ 9

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  638 F. Supp. 3d 227 (E.D.N.Y. 2022) ............................................................................ 11

*Joffe v. King & Spalding LLP*,
  No. 17-CV-3392 (VEC), 2019 WL 4673554 (S.D.N.Y. Sept. 24, 2019) ................................ 10

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) .................................................................................................... 9

*Leonard v. Stemtech Int'l Inc.*,
  834 F.3d 376 (3d Cir. 2016) ....................................................................................... 12

*Lippe v. Bairnco Corp.*,
  288 B.R. 678 (S.D.N.Y. 2003),
  *aff'd*, 99 F. App'x 274 (2d Cir. 2004) ...................................................................... 10

*McCullock v. H.B. Fuller Co.*,
  61 F.3d 1038 (2d Cir. 1995) ....................................................................................... 10

*SEC v. Yorkville Advisors, LLC*,
  305 F. Supp. 3d 486 (S.D.N.Y. 2018) ........................................................................... 9

*Under a Foot Plant, Co. v. Exterior Design, Inc.*,
  No. CV BPG-15-871, 2017 WL 3593014 (D. Md. Aug. 21, 2017) ....................... 6, 7, 9, 10, 12

I.    INTRODUCTION

Plaintiff Michael Gaffney hereby responds to and opposes Defendants' Motion *In Limine* No. 3 (ECF 104, the "Motion") to exclude the expert testimony of Professor Jeffrey Sedlik relating to the concept of a competitive use multiplier. Defendants' motion should be denied because it is a misleading portrayal of the facts and runs counter to established caselaw.

II.   FACTUAL BACKGROUND

A.    Introduction to Michael Gaffney

In August 1977, Michael Gaffney traveled to Muhammad Ali's boxing camp in Pennsylvania, in an attempt to photograph the then-heavyweight champion. (ECF 133, ¶ 2.) At the time, Gaffney was working as a newspaper photographer. (*Id.*, ¶ 7.) Ali was already one of the most famous people in the world, having fought George Foreman, Joe Frazier, and Sonny Liston, among numerous others. (*Id.*, ¶ 3.) Gaffney had no appointment to meet Ali and didn't even know if he would make it into the camp. (*Id.*, ¶ 4.) Gaffney was able to obtain access to Ali's camp and began photographing him. (*Id.*, ¶ 5.) Gaffney particularly impressed Ali by joining him on a pre-dawn training run up a mountain outside of the camp. (*Id.*, ¶ 6.) After a few days, Gaffney told Ali that he planned to leave soon, to get back to his family and his job. (*Id.*, ¶ 7.) As it turned out, Ali's longtime photographer was resigning to run for Congress. (*Id.*, ¶ 8.) Thus, Ali invited Gaffney to join him as his personal photographer. (*Id.*, ¶ 9.)

Over the next year or so, Gaffney had unparalleled and intimate access to Ali, the greatest boxer of all time and one of the most consequential figures of the 20th Century. During that time, Gaffney took over 8,000 photographs of Ali. (*Id.*, ¶ 11.) Gaffney captured not only critical moments in Ali's storied boxing career, including fights with Earnie Shavers and Leon Spinks, but also private moments where very few others were present, including when Ali was training

1

or spending time with family and friends. (*Id.*, ¶¶ 10-11.) During that time, no other photographer had the level of behind-the-scenes access that Gaffney enjoyed with Ali.

### B. Gaffney's Commercial Exploitation of the Photographs

Gaffney's photographs are valuable and highly sought after for licensing. In 2012, Gaffney published many of the photographs in a documentary book entitled *The Champ-My Year With Muhammad Ali*. (ECF 140, ¶¶ 37, 39.) Gaffney's book is currently available for purchase on Amazon for $29.95.[1] Gaffney has also presented his photographs at various exhibitions around the world, including at the Chelsea Gallery in London and the Morris Museum in New Jersey. (ECF 140, ¶¶ 50-54.) Gaffney sells prints of his photographs of Ali, including through the San Franscisco Art Exchange and an online art gallery known as Saatchi Art. (Transcript of November 20, 2020 Deposition of Michael Gaffney ["Gaffney Tr."], 121:8-10 (Linger Decl., Ex. 7).) Gaffney continues to earn a living through his work on exhibitions, licensing to film documentaries, and print sales of his photographs of Ali. (*Id.*, 30:12-14.) Because Defendant Muhammad Ali Entities, LLC ("MAE") owns Ali's image and likeness, Gaffney cannot place his photographs on products or merchandise without MAE's permission. (*Id.*, 190:7-19.) However, Gaffney can and does exploit his photographs of Ali in other forms of media, including through the various exhibitions, which requires no prior authorization from MAE. (*Id.*, 191:2-4.) From his sale of prints and licensing work, Gaffney has generated roughly $30,000 in income. (*Id.*, 238:5-8.)

---

[1] https://www.amazon.com/Champ-My-Year-Muhammad-Ali/dp/1478171243/ref=sr_1_1?crid=3SUSBRG5TDSA1&keywords=gaffney+the+champ&qid=1704753229&sprefix=gaffney+the+chmap%2Caps%2C188&sr=8-1

C.  **Gaffney's Relationship with Defendants**

On February 1, 2011, Gaffney entered into a license agreement with MAE. (ECF 133, ¶ 13.) The agreement provided, among other things, for Gaffney to be paid certain royalties for merchandise and advertising, but granted MAE "the right to use the Photographs for Promotional and Marketing Purposes for no charge." (ECF 133, ¶ 22.) Despite MAE's obligation to seek Gaffney's prior written consent for merchandising and advertising, MAE only did so on only two occasions. (ECF 133, ¶ 21.) ABG acquired MAE in late 2013. (ECF 133, ¶ 26.) Recognizing the value of Gaffney's work, ABG selected one of Gaffney's photographs as the official obituary photograph of Ali for three straight years (2016 to 2018). (Preliminary Expert Report of Professor Jeffrey Sedlik ["Sedlik Report"], Exhibit N at 8 (Linger Decl., Ex. 5).)

The expiration date of the agreement between Defendants and Gaffney was January 31, 2015. (ECF 133, ¶ 14.) As the agreement was nearing expiration, Gaffney attempted to renegotiate the royalty rates that he would earn for the use of his photographs in connection with merchandise and advertising. (ECF 140, ¶ 101 & Response.) As Professor Sedlik explained based on his review of the correspondence between Gaffney and ABG, Gaffney was "very unhappy" with the agreement because "he wasn't getting the credit that he was promised." (Transcript of August 12, 2021 Deposition of Jeffrey Sedlik ["Sedlik Tr."], 142:23, 145:1 (Linger Decl., Ex. 6).) As Gaffney further explained in deposition, "I attempted to renegotiate the contract with [ABG executive] Jasen Wright." (Ex. 7 (Gaffney Tr.), 186:24-25.) Gaffney presented several offers to Wright and ABG, but ABG refused to deviate from terms of the expiring contract. (*Id.*, 188:15-18, 193:5-10, 253:20-24; ECF 133, ¶ 34.) On March 4, 2015, Gaffney sent notice by email forbidding any further use by ABG or MAE of Gaffney's photographs. (ECF 133, ¶ 35.)

3

### D. Professor Jeffrey Sedlik's Experience and Qualifications

Defendants do not challenge whether Professor Sedlik is qualified to offer an expert opinion in this case. And for good reason, as he is eminently qualified to do so.

Professor Sedlik has 25 years of experience working in the photography, advertising, product marketing, technology, and design industries. Currently, Sedlik serves as the president and CEO of the PLUS Coalition, a standards-setting body for the design, advertising, and publishing worlds. He has served as a professor at the Art Center College in Pasadena, California for 20 years and teaches courses on copyright design, business practices, and photography. Since 1986, Sedlik has served as the President of Sedlik Productions/Sedlik Design, a commercial photography, design, and film production company. He is the former President of the Advertising Photographers of America ("APA"), a leading trade association for commercial photographers and videographers. He has represented the APA in discussions with the U.S. Copyright Office and worked with organizations around the world to develop and maintain licensing standards.

### E. Professor Sedlik's Methodology in this Case

To determine actual damages for the infringed photographs, Professor Sedlik applied the same general methodology that he has used and been accepted in other copyright cases.

Professor Sedlik calculated "the fee that a willing seller would have reasonably required a willing buyer to pay at the time of the infringement." (Ex. 1 (Sedlik Report) at 17.) To do so, he obtained license fee quotes from four licensing agencies—the Associated Press, Getty, Magnum Photos, and Redux Pictures. (*Id.* at 18; Exhibit J to Sedlik Report ["Ex. J"] (Linger Decl., Ex. 2).) Sedlik sent each agency a generic image of Muhammad Ali. (Ex. 2 (Ex. J) at 1, 6, 9, 10.) Sedlik carefully selected an image where "multiple competing images" were also available. (Ex. 6 (Sedlik Tr.), 223:24-224:3, 224:9-13.) Sedlik requested quotes in three media categories: social

4

media, prints/posters, and apparel. (Ex. 2 (Ex. J) at 1, 6, 9, 10.) Sedlik then averaged them to calculate an average market rate, per year, for each of the three media categories. (Ex. 3 (Ex. K).) He applied the average market rate to each of Defendants' infringing uses, selecting the appropriate market rate for each use, based on whether the photograph was used in social media, prints/posters, or apparel. (Ex. L to Sedlik Report ["Ex. L"] (Linger Decl., Ex. 4).) Because the quotes he received were for just one-year of use, and some of the infringement occurred over the span of multiple years, Sedlik applied multiple "license units" for certain photographs. (Ex. 4 (Ex. L) at 3.) He then summed all of the license fees, across the various uses, to arrive at an actual damages base of $362,665. (Ex. 1 (Sedlik Report) at 18.)

When Sedlik obtained the license quotes, he did not reveal to the licensing agency the position or relationship of the parties. As Sedlik stated in his report, "[t]he above calculations do not contemplate a scenario in which an image licensor is approached by a direct competitor seeking to purchase licenses to make competing use of the licensor's photographs." (Ex. 1 (Sedlik Report) at 19.) When the parties are in fact competitors, Sedlik stated that "the image licensor would reasonably expect to require and receive a substantially greater fee than would be required of a non-competitor." (*Id.*) Based on Sedlik's "knowledge and experience," "a licensor would reasonably require a competitor to pay a license fee that is 5 to 10 times greater than market rates otherwise available to a non-competing license." (*Id.*)

The competitive use multiplier of 5x-10x makes straightforward economic sense. As Sedlik explained at his deposition, "competition really drives pricing in the marketplace" and when dealing with a competitor who they do not normally want to do business with, a photographer "would charge at least five to ten times more." (Ex. 6 (Sedlik Tr.), 195:1-2, 222:14-17.) If a rival photographer approached Sedlik and asked to display one of Sedlik's own

5

2371102.1

photographs on the other photographer's website, "[Sedlik] would probably tell [them] to go packing in a respectful way." (*Id.*, 222:12-13.) However, under the willing licensor/willing licensee model, a photographer is "forced to go through with that transaction," and as a result, they would demand a higher fee. (*Id.*, 222:14-15.) The 5x-10x range is grounded in Sedlik's vast "personal experience in discussing competitive use issues actual licensors." (*Id.*, 222:22-24.) Sedlik revalidated his long-held opinions by conducting a survey of five commercial photographers and asking them what they would charge "to competitor versus a noncompetitor." (*Id.*, 223:3-10.) Sedlik's survey was performed "a couple of years ago" and "supplements conversations that I have in town hall meetings around the country and, actually, around the world, with photographers." (*Id.*, 288:6-14.)

In sum, Sedlik's methodology regarding the competitive use multiplier is sound, consistent with basic economic principles, and grounded in his years of experience in the licensing field.

### III. ARGUMENT

#### A. The Competitive Use Multiplier Has Been Endorsed by Multiple Courts.

The competitive use multiplier has been utilized by Professor Sedlik in other copyright cases. The District of Maryland held that a 5x-10x competitive use multiplier—the same multiplier used here—represented "a reasonable estimate of what a willing seller could reasonably require of a willing buyer to compensate for the buyer's competitive use." *Under a Foot Plant, Co. v. Exterior Design, Inc.*, No. CV BPG-15-871, 2017 WL 3593014, at *5 (D. Md. Aug. 21, 2017). The case involved two parties that were sellers and distributors of garden plants, and the Court found that the parties' "competitor status" would yield "an additional five-to-ten times premium for competitive use." *Id.* at *5 n.19. The Court considered, yet rejected, many of the same criticisms that Defendants raise here, holding that "Rule 702 permits an expert to draw

6

conclusions based primarily on experience" and also, that the plaintiff's own licensing history was not as probative in calculating fair market value as Sedlik's methodology. *Id.*, at *5. Moreover, the inexact range of values—5x to 10x—was not a sign of unreliability, but designed "to compensate for the inherent imprecision of any single number." *Id.*

The District of New Hampshire also permitted Professor Sedlik to use a competitive use multiplier of 5x-10x to "to capture the scenario in which an image licensor is approached by a direct competitor." *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, No. 17-CV-747-LM, 2020 WL 60351, at *7 (D.N.H. Jan. 6, 2020). The Court denied the defendant's motion *in limine* on this issue, finding that the defendant "may cross-examine Sedlik as to any perceived deficiencies in his opinion and present its rebuttal expert." *Id.*, *6-8.

    **B.**  **The Competitive Use Multiplier is Appropriate and Admissible Here.**

Based on this authority, Professor Sedlik should be permitted to testify at trial about the competitive use multiplier. Defendants' motion acknowledges this authority, but then contends that Gaffney and Defendants are not competitors. (Motion, 11-12.) Defendants argue that "*Under a Foot Plant* and *D'Pergo* involved parties who directly competed against one another," but then Defendants claim, without any supporting evidence, that "Gaffney does not directly compete with" Defendants. (*Id.*, 12.) Defendants' arguments are meritless. Gaffney has the right and does reproduce, publicly display, distribute, and sell copies of photographs of Muhammad Ali (and/or authorize others to do so). (Ex. 7 (Gaffney Tr.), 121:8-10.) In fact, in 2012, Gaffney published a book containing many of his photographs of Ali. (ECF 140, ¶¶ 37, 39.) Gaffney also licenses his photographs to exhibitions, film, and television. (Ex. 7 (Gaffney Tr.), 238:5-8.) Similarly, Defendants reproduce, publicly display, distribute and sell copies of photographs of Muhammad Ali (and/or authorize others to do so). While Gaffney lacks the right to use Ali's image in connection with other products, or in advertising for those other products, that does not preclude

7

him from licensing solely his photographs (depending on the use, the applicable third party may also need to obtain Ali's name and likeness rights). (*Id.*, 190:7-19.) But that does not mean that Gaffney and Defendants are not competitors or that the competitive use multiplier is inadmissible, as Defendants contend. Indeed, it is just the opposite—both Gaffney and Defendants license the rights to exploit different photographs of Ali.

*D'Pergo* drives this point home – you don't need to have identical business models to be considered competitors under Sedlik's methodology. There, the plaintiff, D'Pergo Custom Guitars, was a small company based in Windham, New Hampshire that builds and sells high-end, hand-made guitars by sourcing its own raw materials. The defendant, Sweetwater, was a billion-dollar retailer that sells guitars manufactured only by third parties, and unlike D'Pergo, does not build its own guitars. *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 561 F. Supp. 3d 114, 117 (D.N.H. 2021) (discussing and distinguishing the parties' business models). Here, while there are certainly some differences in their business models, Gaffney and Defendants are both indisputably in the business of selling and distributing images of Muhammad Ali. At a minimum, the parties' competitive relationship is a topic that can be explored at trial and decided by the jury.

Defendants argue that Sedlik's testimony is flawed because he himself "did not opine that the parties] are direct competitors." (Motion, 8.) But Defendants offer no reason why Sedlik, an expert in the licensing of copyrighted photographs, was obligated to perform a separate analysis of Gaffney and Defendants' respective business models, when there is a mountain of evidence on that score in the record. In addition to the evidence that both parties license photographs of Muhammad Ali, Professor Sedlik explained that, based on his review of the correspondence between Gaffney and ABG, Gaffney was "very unhappy" with his expiring agreement with

Defendants. (Ex. 6 (Sedlik Tr.), 142:23, 144:25-145:8.) As Sedlik further explained, Gaffney would have demanded more compensation from ABG because he found his relationship with ABG to be unacceptable. (*Id.*, 228:22-229:4.) The testimony demonstrates that there is sufficient foundation for the competitive use multiplier. Moreover, Defendants' criticisms regarding Sedlik's assumptions and foundation go to weight, not admissibility. *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 508 (S.D.N.Y. 2018) (Daniels, J.) ("objections to an expert's assumptions go to weight rather than admissibility").

### C. Defendants' Remaining Complaints are Meritless.

Defendants have failed to distinguish *Under a Foot Plant* and *D'Pergo* — two cases permitting Professor Sedlik to use a competitive use multiplier in determine the fair market value of a copyrighted photograph. Defendants argue that Professor Sedlik's opinions regarding the competitive use multiplier is "inadmissible" because: (1) Sedlik relied on his decades of knowledge and experience in the licensing industry, rather than citing "real-world transactions"; and (2) there is allegedly no "explanation" as to why the multiplier ranges from 5x-10x." (Motion, 7-10.) Both of Defendants' complaints are legally meritless and ignore contrary evidence of record, including Sedlik's actual testimony.

#### 1. Professor Sedlik Properly Relies on His Decades of Licensing Experience.

It is well-established that an expert may rely only on his experience in the field when testifying before a jury. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999) (expert may rely on "discussions with peers" and "attendance at conferences and seminars" despite the absence of a published study on the topic); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686

9

2371102.1

(S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) ("Experience may provide a sufficient foundation for expert testimony."). Any lack of textual evidence, or specific examples, for an expert's opinions goes to the weight of the evidence, and is not a basis to exclude an expert. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (attacks regarding an expert's lack of textual support for his opinion, go to the weight, not the admissibility, of the opinion); *Conti v. Doe*, No. 17-CV-9268 (VEC), 2020 WL 6162104, at *9 (S.D.N.Y. Oct. 21, 2020) (expert "need not identify a specific peer review article or written rule to render his opinion admissible" where the expert possessed significant experience in the field). In *Under a Foot Plant*, involving Professor Sedlik, the Court recognized that an expert may rely primarily on his experience. *Under a Foot Plant,* , 2017 WL 3593014, at *5 ("Rule 702 permits an expert to draw conclusions based primarily on experience …").

Here, Professor Sedlik's extensive experience in this area is sufficient to pass *Daubert*. Sedlik has extensive experience in the photography licensing field, authored leading reference materials for photographers who license their works, taught classes on licensing, and licensed numerous of his own photographs to licensors. (Ex. 1 (Sedlik Report) at 1-5.) The 5x to 10x range for the competitive use multiplier is grounded in Sedlik's "personal experience in discussing competitive use issues with actual licensors." (Ex. 6 (Sedlik Tr.), 222:22-23.) As Sedlik stated in his report, "[b]ased on my knowledge and experience, a licensor would reasonably require a competitor to a pay a license fee that is 5 to 10 times greater than market rates otherwise available to a non-competing license." (Ex. 1 (Sedlik Report) at 19.)

Survey analysis is not necessary when an expert has experience in the field. *Joffe v. King & Spalding LLP*, No. 17-CV-3392 (VEC), 2019 WL 4673554, at *6 (S.D.N.Y. Sept. 24, 2019) (lack of survey did not preclude testimony, where expert had significant experience and

credentials). However, Sedlik testified that he previously validated his long-held opinions by speaking to "five commercial photographers who are actively licensed in their work" and asking them how much more they would charge to a "competitor versus a noncompetitor." (*Id.*, 223:9-10.) Contrary to Defendants' claim, the survey was not "post hoc," but was conducted by Sedlik "a couple of years" prior to his report. (*Id.*, 288:7.) An expert may reasonably rely on survey evidence when it is consistent with their personal experience. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 286 (E.D.N.Y. 2022).

The competitive use multiplier is amply supported by Sedlik's experience in the field.

### 2. It Is Entirely Proper to Provide a Range of Multiplier Values.

Defendants argue that the competitive use multiplier is inadmissible because Sedlik allegedly does not explain why it ranges from 5x-10x or how to select a number within that range. (Motion, 9.) Not so. Sedlik *did* explain why it ranges from 5x-10x. Sedlik relied on "real-world practice" and his "personal experience in discussing competitive use issues with actual licensors." (Ex. 6 (Sedlik Tr.), 222:1, 222:21-24 ("Q. **Why five to ten?** A. Because that's my personal experience in discussing competitive use issues with actual licensors.").) As Sedlik further explained, if a rival photographer approached Sedlik and asked to display one of Sedlik's own photographs on the other photographer's website, "[Sedlik] would probably tell [them] to go packing in a respectful way." (*Id.*, 222:12-13.) However, under the relevant willing licensor/willing licensee model, a photographer is "forced to go through with that transaction," and as a result, they would demand a higher fee. (*Id.*, 222:14-15.) Sedlik revalidated his long-held opinions by conducting a survey of five commercial photographers and asking them what they would charge "to competitor versus a noncompetitor." (*Id.*, 223:3-10.) Sedlik's survey was performed "a couple of years ago" and "supplements conversations that I have in town hall meetings around the country and, actually, around the world, with photographers." (*Id.*, 288:6-

11

14.) Thus, the 5x-10x range is based on Sedlik's experience and discussions with other photographers.

That Sedlik provided a range, rather than a single figure, for the competitive use multiplier does not inadmissible. As the Court held in *Under a Foot Plant*, "Professor Sedlik specifically provided a range of values to compensate for the inherent imprecision of any single number." *Under a Foot Plant*, 2017 WL 3593014, at *5. Courts routinely allow multiplier ranges in determining damages of even *greater* ranges than the one here. *See, e.g.*, *Devengoechea v. Bolivarian Republic of Venezuela*, No. 12-CV-23743-PCH, 2014 WL 12489848, at *3 (S.D. Fla. Apr. 25, 2014) ("a multiplier of between 2.0 and 10 was warranted and reasonable" to calculate the fair market value of a historical collection). In a case involving Professor Sedlik, the Third Circuit affirmed the use of two multipliers, one ranging from 3x-5x and another ranging from 3.75x to 8.75x, which would allow the jury to award anywhere between $1.4 to $3 million. *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 385 (3d Cir. 2016). There is nothing wrong with presenting a range of damages figures to the jury and then allowing them to determine an appropriate award.

### IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion *in Limine* No. 3 should be denied.

Date: January 12, 2024

Respectfully submitted,

   */s/ Robert E. Allen*
Robert E. Allen (admitted *pro hac vice*)
Lawrence M. Hadley (admitted *pro hac vice*)
Jason C. Linger (admitted *pro hac vice*)
GLASER WEIL FINK HOWARD JORDAN & SHAPIRO LLP
10250 Constellation Blvd., 19th Fl.
Los Angeles, CA 90067
Telephone: (310) 282-6280

rallen@glaserweil.com
lhadley@glaserweil.com
jlinger@glaserweil.com

Jack Spinella
Spinella Law Group, LLC
425 Madison Avenue
New York, New York 10123
Telephone: (908) 947-2336
jspinella@spinellalawgroup.com

*Attorneys for Plaintiff Michael Gaffney*

13

2371102.1

## CERTIFICATE OF SERVICE

      I hereby certify that on January 12, 2024, a true and correct copy of the foregoing **MEMORANDUM OF LAW IN OPPOSITION AND RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 3 REGARDING THE COMPETITIVE USE MULTIPLIER** was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                      */s/ Robert E. Allen*
                      Robert E. Allen

2371102.1