# EXHIBIT 6

Page 141

1  of the email correspondence with those quotes to
2  document where those fees came from that are listed
3  in -- let's see -- in K.
4       Q.  Okay.  And then L -- did you create
5  this table?
6       A.  Yes, J, K, L, and M.
7       Q.  Okay.  Now I want to ask you about --
8  let's see.  If I still have control, I'm going to
9  scroll down to Page 10.
10          This is the "Background" section of
11 your report.  I'm going to read -- one, two, three,
12 four, five -- six lines down.
13          You write:  "On expiration of the 2014
14 Agreement, Gaffney provided notice of termination
15 to ABG in a letter dated March 4, 2015."
16          Is that correct?
17      A.  That's what it says here.  I would need
18 to look back at the document if you're asking me if
19 that date is correct.
20      Q.  Yeah, I'm asking you about all -- if
21 all of that information is correct.
22      A.  Okay.  So then I need to stand up
23 again.  One second.
24          I am coming in with Exhibit D to one
25 of the complaints that has the letters in it.

Page 142

1       Q.  Yeah.  I ask because you don't cite to
2  anything for these propositions here, unless your
3  Footnote 6 is meant to be the citation for the
4  entire paragraph up to that point.
5       A.  I think it is.  I mean, it would be
6  preferable to have a cite to the actual document for
7  the reasons that we're discussing right now, but let
8  me just -- March 4, 2015.
9           Exhibit D doesn't have the termination
10 letter in it that resulted from an email discussion
11 with an ABG representative.  So I don't have that
12 right in front of me to verify the date.
13      Q.  Okay.  But it's your understanding that
14 the 2014 agreement expired and then Gaffney provided
15 a notice of termination.
16          Do you have an opinion on why Gaffney
17 provided a notice of termination after the
18 agreement had expired?
19      A.  I understand, from Mr. Gaffney's
20 deposition testimony and in reading through his
21 correspondence that's in Exhibit E to that
22 complaint, as well as the termination letter, that
23 Mr. Gaffney was very unhappy with the terms of the
24 agreement that he was in with the ABG/MAE
25 defendants, and that --

Page 143

1       Q.  The agreement that had expired?
2       A.  I beg your pardon?
3       Q.  The agreement that had expired?
4       A.  There were email exchanges leading up
5  to that.  It didn't happen in a vacuum.  So he had
6  attempted to renegotiate that agreement, making a
7  number of offers and engaging in the back-and-forth,
8  each time ABG/MAE defendants declining to accept his
9  terms.  And when he reached the end of that road,
10 because he was happy with the agreement, he wanted
11 to make sure that they were on affirmative and
12 constructed notice that it was terminated and that
13 they should stop using the photographs as would be
14 required at the termination of the agreement, with
15 exceptions noted in the agreement for products that
16 would have already been manufactured and that needed
17 to be sold off.
18          So that's -- he was just unhappy with
19 the agreement, and that's why he tried to
20 renegotiate it.  When they wouldn't change the
21 agreement, he gave them that notice.
22      Q.  Okay.  But if the agreement had already
23 expired, according to Mr. Gaffney, do you have an
24 opinion on whether or not he needed to send a notice
25 of termination?

Page 144

1       A.  I think -- yes, I do have an opinion.
2  And so it's my understanding that his notice of
3  termination would not be required because the
4  agreement had terminated.  He was sending -- it had
5  terminated by its terms.  He was sending that
6  notification to make sure -- or to attempt to avoid
7  any misunderstandings as to whether or not any kind
8  of residual rights existed or there was some implied
9  right to continue to make use of his images or to
10 license his images or use his images in any way.
11 And he very apparently wanted to make sure --
12 because ABG/MAE is not a tiny mom-and-pop shop --
13 that they were on notice that they needed to cease
14 all usage of his photographs and make sure that he
15 did that in writing.  And part -- I mean, we
16 photographers would do that to ensure that there
17 could be no claim of some kind of misunderstanding
18 of what the rights were, even though it was not
19 necessary to do that.
20      Q.  Do you have an opinion on whether
21 Mr. Gaffney felt that MAE/ABG was not abiding by the
22 terms of the then-expired agreement?
23      A.  I can't pinpoint whether it was in an
24 interrogatory response or admission or deposition
25 testimony, but I believe he was upset that he wasn't

Page 145

 1  getting the credit that he was promised, and also,
 2  the agreement had -- you know, gave ABG/MAE
 3  defendants some rights for advertising use during
 4  the term only that -- you know, it's my
 5  understanding that it was not equitable to him, even
 6  though he had agreed to it earlier, in that the
 7  percentages that he was getting and the amounts that
 8  he was receiving were not to his liking.
 9         So he wanted to renegotiate, and when
10  that wasn't possible, and alternative constructs
11  were presented and rejected, the agreement
12  terminated, and he made sure to provide written
13  notice of termination and to cease use.
14      Q.  Okay.  But you understand that the
15  agreement had already, according to Mr. Gaffney,
16  expired by its terms; right?
17         So it wasn't terminated.  It expired
18  by its terms; correct?
19      A.  Yes.  It expired by its terms.
20      Q.  And there were some continuing rights
21  that the licensee, the ABG Defendants, retained
22  post-expiration; isn't that correct?
23      A.  I understand that it's in dispute as to
24  what those rights were, and, obviously, you're
25  asking me the question, and I'm going to opine.  I'm

Page 146

 1  not an attorney; however, I teach -- first of all, I
 2  operate a standards body for the standards and
 3  practices in describing the licensed rights for
 4  photographs, and I also teach that subject at the
 5  college level, et cetera.  But I'm not an attorney.
 6  So this is my knowledge based on my experience and
 7  the practical application of copyright law in the
 8  business of business licensing imaging.
 9         Okay.  With all that said -- and I
10  just had to say it -- the rights that persisted
11  after the agreement, if any, were -- based on my
12  understanding in reading as an expert on image
13  licensing agreements, would be products that had
14  already been manufactured and -- by licensees of
15  ABG/MAE defendants to be able to sell off those
16  products rather than to destroy them or re-home
17  them.  And, I mean, the agreement is going to be
18  judged by its four corners, but that's my
19  understanding from an industry perspective.
20         With regard to all this advertising
21  and branding usages, that ABG/MAE defendants
22  continued to exploit those copyrights, those
23  images.  After the expiration of the agreement,
24  none of that was permitted.
25      Q.  Okay.  And that is your expert opinion

Page 147

 1  based on what?
 2      A.  On being the leading expert in image
 3  licensing and my experience of 35 years licensing
 4  images, acting on behalf of image licensors and
 5  copyright owners, and all the experience that I have
 6  combined.
 7      Q.  Okay.  Okay.  Is it based at all on the
 8  written agreement between the parties?
 9      A.  It is based on my understanding of the
10  written agreement between the parties from an
11  industry standards and practices perspective.
12         In other words, what do those words
13  mean?  I run the organization that determines what
14  those words mean.  I lead the standard -- lead the
15  standards initiatives that are global, including
16  adding seasoned design firms and licensors and
17  licensees and educators and museums and libraries,
18  et cetera.  And so I'm not rendering a legal
19  opinion.  I'm opining on the practical application
20  of copyright licensing in day-to-day practice as to
21  what the terms -- what the terms mean.
22      Q.  When you say "terms," you mean the
23  written terms in the written agreement between the
24  parties; correct?
25      A.  That's right.  The courts have

Page 148

 1  consistently allowed me to opine on the meaning of
 2  terms used in image licensing agreements.
 3      Q.  Okay.  Let's scroll to Page 13 of your
 4  report.  Here in this first full paragraph, you
 5  say:  "Clients seeking stock images typically visit
 6  stock image websites, search for images meeting
 7  their requirements, and then purchase licenses and
 8  download the images for use."
 9         Do you see that?
10      A.  Yes.
11      Q.  Your Sedlik Productions company, does
12  it operate a stock -- does it operate as a stock
13  agency?
14      A.  All photographers do.  So every
15  photographer -- we create our photographs, and we
16  create, essentially, a bank of assets that we then
17  repeatedly license over the copyright life of the
18  images.
19         So a stock -- to be clear about what a
20  stock image is -- I think that is explained
21  somewhere in the report, but it is just an image
22  that was taken previous to the day it was licensed,
23  I suppose; not on commission, but an existing
24  image.
25         And so, for example, the Phil Stern

Case 1:18-cv-08770-GBD-OTW   Document 233-7   Filed 01/12/24   Page 4 of 6

Deposition of Jeffrey Sedlik                                    Michael Gaffney v. Muhammad Ali Enterprises, LLC, et. al.

Page 193

 1   A.  And those, number two and number three,
 2  are not within my opinions, and I have no opinion on
 3  those.
 4   Q.  Okay.  And just to backtrack, did you
 5  have an opinion on whether all of the photographs at
 6  issue in this litigation, in these actions, whether
 7  Mr. Gaffney does, in fact, own exclusive copyright
 8  in those photographs?
 9   A.  I was given that assumption, and I'm
10  not going to -- I would have to go validate that.
11  So I won't be opining on that at trial.
12   Q.  Okay.  Sorry.  That was an aside.
13  We're going to go back to your statement about how
14  to determine actual damages.
15    You say they are determined by the fee
16  or, in part, by the fee that a Willing Seller would
17  have reasonably required a Willing Buyer to pay.
18    And my question is, what if there is
19  no Willing Buyer at that fee?
20   A.  Well, it has to be reasonably required.
21  Now, we know that Mr. Gaffney was not a Willing
22  Seller at the rates that were included in the
23  agreement, in the agreement that terminated, and so
24  those terms were objectionable to him.
25    He voiced that repeatedly.  He was

Page 194

 1  very unhappy with that arrangement, and he
 2  attempted to renegotiate it, and that was rejected.
 3  And the agreement terminated, and then he provided
 4  confirmation notice of the termination.
 5   Q.  But the agreement expired; correct?
 6   A.  It expired by its terms, right.
 7   Q.  Okay.  And so my question for you is,
 8  what if there's no Willing Buyer at the fee that a
 9  seller requires?
10   A.  That's handled, in part, by the way
11  that I perform my analysis because I go out to folks
12  or licensors that are in the business of licensing
13  to Willing Buyers day in and day out, and the fees
14  that they offer in the marketplace are the fees that
15  are paid by the marketplace.  They are in the
16  business of licensing.  And they license all day,
17  every day.  So...
18   Q.  So whatever fee a Willing Seller sets
19  is necessarily reasonably required to be paid by a
20  Willing Buyer?
21    MR. BURKE:  Objection.  Form.
22  Mischaracterizes.
23   A.  No.  No, I wouldn't say that.  But I
24  would say that, if there are in the landscape of
25  image licensing sellers who are offering images at

Page 195

 1  market-driven rates -- I mean, competition really
 2  drives pricing in the marketplace.
 3    And as we've seen in the results of my
 4  kind of limited survey, there can be a range from
 5  different -- different sellers, and so the most
 6  effective way is, because there can be -- you know,
 7  there's a high ground, there's a mid-ground,
 8  there's a low ground, and when you start reaching
 9  out to buyers, you get that range.  As long as I
10  didn't get some kind of result like $100,000 versus
11  $100 -- that would be just completely out of the
12  ballpark in terms of one of those prices -- then
13  averaging them is an effective way of coming to a
14  market average for determining the rates that --
15  and I would say that similarly situated parties
16  without identifying the parties would agree to.
17    When I say "Willing Buyer/Willing
18  Seller," I'm not assuming that it is specifically
19  Gaffney and specifically MAE/ABG.  We are looking
20  at similarly situated buyer and seller.
21    Or in the case of these surveys, it is
22  basically any, any buyer that approaches them is
23  going to get those prices.
24  BY MS. RUTHERFORD:
25   Q.  But wouldn't it be fairer to say --

Page 196

 1  more fair to say that actual damages are determined,
 2  in part, that by the fee that a Willing Seller and a
 3  Willing Buyer agree on at the time just prior to the
 4  infringement?
 5   A.  Well, I mean, we can look at precedent
 6  and how it's worded, and, you know, there is slight
 7  variations on how it is worded.  Going from -- the
 8  H.R. Pufnstuf case, in Jarvis, and then Second
 9  Circuit cases, and it is what the Willing Seller
10  could have reasonably required of a Willing Buyer.
11    And right in there is the Willing
12  Buyer, and that's an important piece of that
13  puzzle.  I'm not saying that the buyer -- an
14  unwilling buyer should be forced to license at that
15  rate, but these are market rates.  Go out to the
16  image licensing marketplace and I'm not asking for,
17  "hey, triple your rates because it is
18  infringement."
19    I'm not asking for any punitive
20  measure whatsoever.  It is, what do you sell your
21  images at for this specific usage that is alleged
22  to be unauthorized?  It's the same scope of usage
23  that's been alleged.  What's the fee?  And then
24  averaging that from three to four different sellers
25  and that sell images at those rates all the time.

Page 221

1  you need to go out and you don't want to select, or
2  I don't want to select, the most rare image of Ali
3  ever, you know, even though Mr. Gaffney's images are
4  unique and incredibly rare, I think -- it's my
5  opinion -- I wasn't asked to validate that, so I
6  didn't apply the scarcity multiplier to it.  I just
7  suggested if the images are found to be rare, that
8  should be applied.
9          But the reason that you wouldn't sell
10 a scarce image at the same price as a common image
11 is because the scarce image is more valuable in the
12 image licensing marketplace because the buyer can't
13 go anywhere else or has limited other options to
14 get that image for their use, whether that's a
15 documentary or an ad or editorial.
16     Q.  Okay.
17     A.  There we go.
18     Q.  Okay.  Mr. Sedlik, where did you come
19 up with this methodology for a competitive
20 multiplier?
21     A.  Okay.  So we're switching gears to
22 competitive multipliers now; is that right?
23     Q.  Yes.
24     A.  Okay.  So for competitive use in this
25 hypothetical, if you have -- well, where did I come

Page 222

1  up with it?  From real-world practice.
2          If you and I aren't competing in
3  business and you come to me -- and let's say you're
4  not a photographer.  I'm a photographer, and you
5  want to license my Miles Davis image to put on your
6  website and you're an attorney.  So I'm going to
7  have a price for that.
8          If you're a fellow photographer, and
9  you want to put my Miles Davis image on your
10 website to advertise your services, I'm going to
11 take that competitive use into account in pricing
12 to you.  I mean, I would probably tell you to go
13 packing in a respectful way.
14         But in the hypothetical, you're forced
15 to go through with that transaction, and I would
16 most definitely charge at least five to ten times
17 more than what I would for a noncompeting use.  And
18 that also holds water.
19         You can look at Under-A-Foot Plant
20 Co. v. Exterior Designs.
21     Q.  Why five to ten?
22     A.  Because that's my personal experience
23 in discussing competitive use issues with actual
24 licensors.
25         And as I started to say -- and I'm

Page 223

1  going to keep this to five seconds, I promise you.
2  As I started to say in my earlier answer, but was
3  cut off, I recently validated those opinions by
4  going out to five commercial photographers who are
5  actively licensed in their work and, without
6  telling them anything, asking them for those
7  percentages:  What would you charge more
8  percentagewise for a scarce image versus a
9  non-scarce image to a competitor versus a
10 noncompetitor?  I didn't do it for this case, but I
11 wanted to validate my existing understanding and
12 opinions.
13     Q.  So you're relying on that survey that
14 you did?
15     A.  No.  That wasn't my testimony.  My
16 testimony was that that was my existing opinion, an
17 existing and long-standing opinion, and that I
18 revalidated my opinion by doing a limited survey.
19     Q.  Okay.  This survey, I'd like a copy,
20 please.
21     A.  Okay.
22     Q.  What was the scarcity of the photos
23 used for the reference fee quotes?
24     A.  I attempted to pick images for which
25 there were -- for which I could see that there were

Page 224

1  multiple competing images, and that does take a
2  measure of understanding licensing and photography
3  and publishing, et cetera.  Now --
4      Q.  Did you keep track of those photos?
5  You said you found multiple competing images.
6      A.  You cut me off again.  I just need to
7  finish that answer, and then I'll answer your next
8  question.
9          So in trying to seek out images to use
10 as reference images, I used images for which there
11 were other images of Ali at the same event or in
12 the same circumstance, and they were not
13 particularly esthetically superior images.
14     Q.  Did you include any of those images
15 that you referenced in your report?
16     A.  I pulled the images that -- can I pull
17 the -- I put pictures of the images in the report,
18 didn't I?
19     Q.  I don't see them.
20     A.  In the screenshot?
21     Q.  If you're talking about your Exhibit J,
22 I don't see images for each of the quotes now.
23     A.  Oh, I see.  Hold on.
24         So I see the images for the Getty
25 Images quote, but I only see the image IDs for the

Case 1:18-cv-08770-GBD-OTW   Document 233-7   Filed 01/12/24   Page 6 of 6

Deposition of Jeffrey Sedlik                Michael Gaffney v. Muhammad Ali Enterprises, LLC, et. al.

Page 285

1  disagreement is new because the opinions are new to
2  me. But I'm not -- I don't really know how to
3  answer your question in that regard, but, other than
4  that, my disagreement with Mr. Buss and his
5  opinions, no.
6      Q.  Okay. And did you have other
7  disagreements with Mr. Buss than the ones that we
8  already elucidated during the course of your
9  deposition?
10     A.  I think I did mention that his -- his
11 tables where he took my tables and mushed them
12 together, he did that incorrectly. And where -- I
13 mean, we would have to go through his report line by
14 line to identify each of my disagreements with him.
15         He and I have different approaches.
16 I'm from the image licensing world, and he's from
17 the economic damages world, and those are related
18 worlds, but we disagree on quite a bit, but I do
19 respect him.
20     Q.  Okay.
21         MS. RUTHERFORD: Okay. I don't have
22 any further questions at this point.
23 BY MS. RUTHERFORD:
24     Q.  Mr. Sedlik, if you can provide any
25 citations to any of the materials that you relied on

Page 286

1  in forming your opinions, that would be appreciated.
2  I realize we're short on time, but you haven't been
3  asked to supplemental your report. I'm not paying
4  you to supplement your report or provide those
5  citations.
6      A.  And I would say to that that to the
7  extent -- so there's a few citations that I have
8  said that I would provide to you, and I'll fulfill
9  those promises.
10         With respect to other things that
11 we've talked about today that you've asked for, I'm
12 going to comply with the Rules and it might
13 require, you know, internal discussion between the
14 firms, but I'll comply with the Rules.
15     Q.  Okay. I'm not -- I'll just go on
16 record to say I am not paying you for -- unless you
17 hear otherwise, I'm not paying for you to produce
18 additional documents or revise your report.
19     A.  So what I will do -- and I acknowledge
20 that, that I understand that. What I will do is
21 have a discussion with retaining counsel about how
22 this, the time that would be associated in doing
23 these things that you've requested would be handled,
24 and then the firms can discuss it. I am not going
25 to assume that you are incurring any billable time.

Page 287

1  I've got to let the firms discuss that situation.
2      Q.  Okay.
3          MS. RUTHERFORD: Okay. So I thank you
4  so much, Mr. Sedlik. It was a very long day, and
5  you answered all my --
6          MR. BURKE: It may be longer yet. I
7  just want to make sure. Could we take maybe five
8  minutes, off the record, for me to check my notes
9  and see if there is anything I need to ask follow-up
10 questions about?
11         MS. RUTHERFORD: Absolutely. Go ahead.
12         MR. BURKE: Thank you.
13         (Brief recess.)
14         MR. BURKE: Back on the record, then.
15              EXAMINATION
16 BY MR. BURKE:
17     Q.  Okay. Professor Sedlik, can you hear
18 me clearly?
19     A.  Yes.
20     Q.  All right. You gave some testimony
21 earlier today about a survey that you had done in
22 connection with your multipliers testimony.
23         Do you remember that testimony?
24     A.  Yes.
25     Q.  Can you give me a quick refresher on

Page 288

1  what that survey was?
2      A.  So there is two surveys at issue: One
3  is the survey that I did where I sampled rates from
4  the marketplace, then took an average, and that's
5  all documented in my report.
6          The other survey that I mentioned is
7  from -- could be a couple of years ago where I
8  contacted a number of photographers to ask them
9  about pricing practices, and that supplements
10 conversations that I have in town hall meetings
11 around the country and, actually, around the world
12 with photographers where we sit down and talk about
13 the status of the business and what their practices
14 are.
15         But the survey that I was talking
16 about was in connection with an unrelated matter
17 and had nothing to do with my opinions in this
18 matter. I didn't base any of my opinions in this
19 matter on a survey in any way. I already had that.
20         This methodology, I established it a
21 number of years ago based on my knowledge and
22 experience and my discussions with people working
23 in the field, not related to that survey, which is
24 a separate matter entirely.
25     Q.  So did you rely on the results of that