# EXHIBIT 7

Case 1:18-cv-08770-GBD-OTW   Document 233-8   Filed 01/12/24   Page 2 of 11

Deposition of Michael Gaffney                         Michael Gaffney v. Muhammad Ali Enterprises, LLC, et. al.

Page 27

CONFIDENTIAL

2020.)

Q. And Mr. Gaffney, did you review the Complaint in the Second Action before it was filed?

A. Yes, I did.

Q. And did you check to make sure each and every allegation was true?

A. Yes, I did.

Q. Okay.

MS. RUTHERFORD: Can we now have Number four, Andrew?

These are the exhibits to the Complaint in the Second Action.

And can we mark this?

THE COURT REPORTER: Yes. This would be Number seven.

MS. RUTHERFORD: Thank you.

(Whereupon, Exhibits
- 2nd Action was
marked as Exhibit 7
for identification,
as of November 20th,
2020.)

MS. RUTHERFORD: And can you give me control, please?

Page 28

CONFIDENTIAL

Whoops. I'll scroll through.

There's three photos. Keep scrolling through to the end, and back up to the top. Okay.

Okay. I'm done with these exhibits for now, Andrew. Thank you.

Q. Okay. Mr. Gaffney, you produced documents in connection with this litigation, correct?

A. Yes.

Q. Were you involved in searching for those documents?

A. Yes, I was.

Q. Was anyone else involved in searching for documents?

A. No, not --

Well, I mean, I was --

I was working with a forensic expert, with Jefferson Sedlik; he's the photo expert, copyright expert that I worked with in producing the discovery, or producing the research, I should say.

Q. Okay. And did he help you search for documents?

A. No, he didn't --

He didn't help me. He helped guide me on

Page 29

CONFIDENTIAL

what I should be looking for; yeah.

Q. Okay.

A. But he was not --

He was in California. I'm in Jersey, and you know, I was doing the -- the -- the research here.

Q. Okay. So, how did you know which documents to search for?

A. Pardon me?

Q. How did you know which documents to search for?

A. Well, we targeted the images that were infringed upon.

Q. Okay. Did you --

And then what documents did you look for in connection with that?

A. Wait, run that question by me again.

Q. I'll ask a different question.

Mr. Gaffney, have you seen MAE and ABG as Written Requests for Documents?

A. I'm not sure if I've seen their requests.

Q. Okay.

A. I was --

I was just trying to do research, and

Page 30

CONFIDENTIAL

find, like information regarding -- regarding the -- the photographs.

Q. Did anyone, other than Mr. Sedlik, provide instructions on which documents to search for?

A. No.

Q. Okay.

A. I worked exclusively with him; he's the expert.

Q. Okay. Mr. Gaffney, are you currently employed?

A. I'm in a retirement phase, but I'm still working on exhibitions, and film documentaries, and I'm involved with print sales; yes.

Q. Okay.

A. But I'm not a shooting photographer, as far as what my business was.

Q. Okay. And the sales and exhibitions, do those all relate to your own photographs?

A. Repeat the question again. I missed the first part.

Q. The sales and exhibitions, do those relate to your own photographs?

A. Yes.

Q. Are you involved in any sales or

Deposition of Michael Gaffney                                    Michael Gaffney v. Muhammad Ali Enterprises, LLC, et. al.

Page 119

CONFIDENTIAL

information for this chart that we're looking at --
  A. Right.
  Q. -- you're saying --
    You're referencing some other chart of exhibitions; is that correct?
  A. I -- I --
    When I was formulating all of this information, I -- I set -- set the images according to the exhibitions I was in; yes. So -- and then that information was drafted onto here.
  Q. Okay. And when you --
    Were you referencing any sale documents; for example, a bill of sale or a receipt, when you provided this information in the Date of First Publication column?
  A. You know, I believe I was through the invoices that came out of the Chelsea show; I believe that's the way I did it.
  Q. When did you first create this chart?
    When did you provide the information in this chart?
  A. Oh, last --
    Probably almost a year ago.
  Q. All right. The last new date --

Page 120

CONFIDENTIAL

  A. I don't --
    You know what, I mean, I can check that, but I --
    I started working on researching it for Jefferson Sedlik, the photo expert, and we just moved forward from there. I don't --
    My timeline's a little bit -- a little bit off. I'm not accurate on the -- on the dates, but --
  Q. Okay. So, the last date that's new here is January 17th, 2012; that's Ali 95. Do you see that?
  A. Ali 95 --
    It just goes down to 85. I can't move it down further.
  Q. There isn't an 85. There's a 95. That's Ali with hand on head after a loss.
  A. Oh, okay. Yeah. I'm sorry.
  Q. I know. It's hard to read. It's --
    Sorry about that.
  A. Okay. Ali --
  Q. Let me see if I can make it bigger.
  A. Okay. Ali 95. Yeah. That's when he lost to Spinks.

Page 121

CONFIDENTIAL

  Q. Okay. And so the date here you see is January 17th, 2012. I managed to make it a little bit bigger. Do you see that?
  A. Yes, I see it.
  Q. Okay. What's the significance of that date?
  A. Well, it's either an exhibition, or a sale of a print through San Francisco Art Exchange, or Saatchi Art; they're selling my prints.
  Q. Okay. Do you have copies of all of the receipts from the sale of your prints?
  A. Yes, most of them.
  Q. Okay. Did you give them to your attorney?
  A. Yes.
    MS. RUTHERFORD: Those were not produced to us, Mr. Allen, so that will be in my letter as well.
       (Request for
       production.)
  A. Okay. We have those. Those are on file.
    MS. RUTHERFORD: Okay.
    MR. ALLEN: I don't know, Jessica, if those were covered by any of the requests for production. So, if we do,

Page 122

CONFIDENTIAL

we're happy to produce them. If not, we obviously would request that you provide new requests for production.
    MS. RUTHERFORD: They were included. We asked for all documents related to the Date of First Publication, and documents related to any sale or license, if --
  Q. Okay. I want to --
    MS. RUTHERFORD: We're done with that exhibit. Thank you, Andrew.
  Q. Now, Mr. --
    You mentioned --
    Let me ask you this; are you familiar with Bill and Maureen Dubrot?
  A. Yes.
  Q. Okay. And you know them to own a company called Land of Legends; is that right?
  A. That's correct.
  Q. Okay. You signed an agreement with them on June 6th, 1997?
  A. That's correct.
  Q. Okay.
    MS. RUTHERFORD: Andrew, can we

Deposition of Michael Gaffney                                   Michael Gaffney v. Muhammad Ali Enterprises, LLC, et. al.

Page 139

CONFIDENTIAL

that this was one of the people that I dealt with. It didn't work out, but, you know, I brought it forward, to keep it honest.
Q. Okay. Again, I'm trying to get a date when you retrieved the slides.
A. Not --
I can't --
(Simultaneous speaking.)
Q. Can you give me --
A. Jessica, I can't remember. All I know was, it was a very short period of time. I think, you know, somewhere in the period of a month, maybe sooner than that. It was a very bad period for me. It was the first time I had tried anything, and it was not successful, and I wanted to end it, and get my images back, and not be -- not be bothered with this person.
Q. Okay. So, if it all happened within a month, that would mean sometime in the month of October, you probably got the images back; fair, given that you signed the Agreement in September?
A. I would --
I mean, I'm --

Page 140

CONFIDENTIAL

I totally don't remember accurately. So, I'm going to tell you I don't remember how long the period of time it was that, you know, it was determined that it wasn't working out for me, and I wanted to protect the images, so I got them back.
Q. Okay. And the slides, did those have copyright notices on them?
A. Yes.
Q. How was that printed?
A. How were the slides printed?
Q. No; how were the copyright notice printed on the --
(Simultaneous speaking.)
A. Oh, it was attached to the slides with a -- you know, it was a small, "c, Michael Gaffney," probably, "all rights reserved."
Q. Okay.
A. You know, pretty much identifying that there was a copyright with it.
Q. Okay. You think that was written on the -- on the frame of the slide?
A. Yes.
Q. Okay. Now --

Page 141

CONFIDENTIAL

A. Written or attached in a label, on a label that was attached to the slide.
Q. Okay. I'm just curious; if this all happened in a month, how many prints did you expect Land of Legends to sell within a month?
A. Well, that wasn't the point. The point was, he was terrible to deal with, communication, everything else, and, you know, my expectation was that he be forthright with me, and keep me -- keep me posted on what was going on with the --
He was doing his show, and it just seemed not a workable situation.
Q. Okay.
A. So, whether or not it was a month, or two months, it was not a -- not a productive period. He did not report back to me any sales and, you know, he failed on the fulfillment of the contract as far as his promises for -- for, you know, for promotion and marketing.
Q. Okay. I don't see anything about promotion or anything. What was his promises with respect to promotion and marketing?
A. Pardon me?
Q. I don't see anything in this written

Page 142

CONFIDENTIAL

Agreement about promotion and marketing. My question to you is what were his promises with respect to promotion and marketing?
A. Well, he would, I guess promote these at --
I guess he was hosting boxing events, celebrity signings. Um, I didn't know much about his business, but, you know, as far as my expectation of what he was going to produce for me, he -- he avoided all conversations about everything he was doing. He was very difficult to get in touch with, seemed to be elusive, didn't return phone calls, and I just had several arguments with him, and was not satisfied with the whole business of his -- business operation, and ended it.
Q. Okay. You mentioned that he was doing a show; was that, like an exhibition of photographs?
A. No, it wasn't an exhibition. He was doing --
He would have events where he would have --
I didn't know his business all that well. So, speaking off the top of my head here, but, as far as I knew, he was having celebrity signature

Case 1:18-cv-08770-GBD-OTW   Document 233-8   Filed 01/12/24   Page 5 of 11

Deposition of Michael Gaffney                    Michael Gaffney v. Muhammad Ali Enterprises, LLC, et. al.

Page 143

CONFIDENTIAL

contests, celebrity signings, and he'd have boxers in, and then he would sell his merchandise, and photographs, and when I -- when I --

When I talked to him, he was very elusive, and it just didn't work out.

Q. Okay. And at these shows, did he offer any of these -- any of the Muhammad Ali prints?

A. Did he offer them? I have no idea. I don't know what he did.

Q. Okay.

A. The point I'm trying to make here is, this was a unsuccessful deal that went bad, so I got my stuff back and that was the end of it.

Q. Understood. And so you said he didn't report any sales. Do you think that he made sales and just failed to report them to you?

A. I don't know. I have no idea. All I know is he wasn't -- he wasn't -- he wasn't --

He wasn't forthright and honest with me and to the point where, you know, I asked him for reports; never got anything.

And so I said, you know, "we're done." I don't want to deal with somebody who can't be honest with me; I'm honest with them, and that was the end

Page 144

CONFIDENTIAL

of it. So, do I know if he made a sale? No. I didn't know anything.

He didn't report anything back to me at all. If he did or he didn't, I have no idea at all.

Q. Okay. How many shows took place between the time that you gave him the slides and the time that you took them back?

A. How many shows --

Explain yourself there.

Q. Well, you mentioned that he was doing these shows with boxers and celebrity signings, I'm wondering how many of those took place between the time that you delivered the slides to him and the time that you took them back?

A. I -- I don't know the answer to that. I'm being candid here. I don't know if he had one show or five shows, or whatever. I don't know. That was part of the problem. I didn't --

I wasn't getting information back from him, and so -- and so I really don't know what he was doing.

Q. Okay.

A. And I -- I don't even know if he was on the Internet back then. I don't know. There

Page 145

CONFIDENTIAL

wasn't -- you know. I think it's a lot different now; you can track everything, but, you know, back then, I don't know if he had an Internet presence or not. I don't even think I was on email back then, so --

Q. Okay. Let's see. If he had the sales sheet with ten images on it, could he make prints from that?

A. From the sale sheet? Could he make prints from the sale sheet?

Q. Yeah.

A. No. Not --

I mean, the quality would be off; nobody would buy a print like that.

Q. Okay.

MS. RUTHERFORD: Okay. I think we're done with that exhibit. Thank you.

Q. I want to ask you about your book, The Champ: My Year With Muhammad Ali.

A. Okay.

Q. You published that book yourself in 2012, correct?

A. Correct.

Page 146

CONFIDENTIAL

Q. And why did you decide to publish the book yourself in 2012?

A. Well, I was exhibiting --

You want the full story? I was exhibiting in London, and I was being interviewed at a radio station, and the last thing that they asked me during the interview was, "so, do you have a book you're going to promote?"

And I said, "no, but I'm working on one," and, Joanna was out in the sound stage after the interview and she said, "so when did you start the book?"

And I said, "right now," so I started the book.

I'll tell you what happened; I didn't realize the popularity of Muhammad Ali until I went to London, and it was a magnificent show, and magnificent turnout. We had boxers coming in. It was just a tremendous exhibition, and the greatest influence for me was, I need to put my story together on my -- on my adventure -- my experience with Muhammad Ali, and so that's what I did.

So, I started working on it. Took me a couple of years to do, and, you know, that's what

Case 1:18-cv-08770-GBD-OTW   Document 233-8   Filed 01/12/24   Page 6 of 11

Deposition of Michael Gaffney                    Michael Gaffney v. Muhammad Ali Enterprises, LLC, et. al.

Page 183

CONFIDENTIAL

1  said, "real estate," but whatever.
2      Q.  I'm just referring to -- right here, to
3  the provision 1.1.2, which calls it:
4          "Themed real estate projects."  Okay.
5  Let's look at the document that is Bates numbered
6  203 to 206, please.
7          Can I have --
8          Do you recognize this document, Mr.
9  Gaffney?  Do you need me to scroll through it?
10     A.  Yeah, it's the Agreement with -- when ABG
11 took over.
12     Q.  Okay.  So, ABG now controls --
13         It says, "ABG now controls MAE
14 photographer agreements, including your Agreement
15 with MAE," right?
16     A.  Right.
17     Q.  Okay.  And let's see, can I get control?
18 I'll scroll down the bottom.  This is your
19 signature, correct?
20     A.  Yes.
21     Q.  And then there's some contact information,
22 and then there appears to be another signature page.
23     A.  Okay.
24     Q.  This time dated July 12th, 2014; is that

Page 184

CONFIDENTIAL

1  your signature?
2      A.  Yes.  It is.
3      Q.  Okay.  And this --
4          But the first time you signed on this
5  page, which is Bates number 204, it -- it's --
6      A.  204.
7      Q.  It looks like the time dated January 24th,
8  2014; do you see that there?  There appears to be
9  two signature pages.
10     A.  Yeah.
11     Q.  The second document is January 24th --
12         (Simultaneous
13            speaking.)
14     A.  I think they were in the process of
15 negotiating a deal with MAE to buy it.
16     Q.  Okay.  So --
17     A.  And they wanted to --
18         They wanted to ascertain what -- if they
19 had all the photographs.
20     Q.  Well, you signed the document twice,
21 right?
22     A.  Right.
23     Q.  Is isn't that right?
24     A.  Yes.

Page 185

CONFIDENTIAL

1      Q.  Okay.  And the next --
2          MS. RUTHERFORD:  Can we mark this
3  as the next exhibit, please?
4              (Whereupon, Bates 153
5              to 154 was marked as
6              Exhibit 15 for
7              identification, as of
8              November 20th, 2020.)
9      Q.  So, this document that you signed, this
10 amends the License Agreement that we were just
11 looking at, correct?
12     A.  Yes; that's right, yes.
13     Q.  Okay.  The next document.  Let's see, on
14 January 14th, 2015, you sent MAE a Proposal,
15 correct?
16     A.  That's correct.
17     Q.  That --
18     A.  Do you have that document?
19     Q.  Yeah.  We're going to look at the
20 document; that's Bates numbered 153 to 154.
21     A.  Okay.
22         MS. RUTHERFORD:  Can I have control
23 please?
24         THE WITNESS:  Pardon me?

Page 186

CONFIDENTIAL

1          MS. RUTHERFORD:  I just asked for
2  control.
3          THE WITNESS:  Oh.
4      Q.  My question for you is, is this a copy
5  of -- of the proposal that you made to MAE on
6  January 14th, 2015?
7      A.  Mh-hm.
8      Q.  Is that a yes?
9      A.  That's --
10         That's correct.
11     Q.  Okay.
12         MS. RUTHERFORD:  Can we mark this
13 as an exhibit, please?
14             (Whereupon, a Letter
15             was marked as Exhibit
16             14 for
17             identification, as of
18             November 20th, 2020.)
19     Q.  And what was your purpose for sending this
20 letter?
21     A.  Well, this was January 14th.  The contract
22 was set to expire at the end of the month,
23 January 31st, and I attempted to renegotiate the
24 contract with Jasen Wright for a new contract.

Case 1:18-cv-08770-GBD-OTW   Document 233-8   Filed 01/12/24   Page 7 of 11

Deposition of Michael Gaffney                           Michael Gaffney v. Muhammad Ali Enterprises, LLC, et. al.

Page 187

CONFIDENTIAL

Q. Okay. And --
 And the terms that you proposed were for a buyout, correct?
A. That was part of the -- part of the deal; yeah.
Q. Okay. It says here.
 "The entire Collection is being offered to ABG for the buyout fee of $100,000, which would assign all rights of ownership to ABG for the sale to licensees of all products, services, promotional uses assigned by ABG for all time with the following exceptions."
 And when it says, "The entire Collection," it's referring to 86 photographs of Muhammad Ali that are presently listed, and 25 additional paragraphs that could be added to the Collection upon review and acceptance by ABG, correct?
A. Yeah, that was the offer.
Q. Okay. And you say those additional 25 photographs are mostly portraits of Muhammad Ali that have commercial value and also -- and also photographs of Muhammad Ali's children, which were previously excluded because of an Agreement with MAE. That's -- that's the Agreement you referenced

Page 188

CONFIDENTIAL

earlier about how MAE couldn't use photographs of Muhammad Ali's children, correct?
A. Right.
Q. But now you were offering those photographs to MAE again?
A. Well, I wanted to see if they would be interested in negotiating that clause out of -- out of the contract with Ali, so that they could be used. The children are older, and I think the protected value that are -- that are Ali originally had would be -- it was an idea that I had. I don't know if it was going to work or not, but I put it out there thinking that they would want to do that.
Q. Okay. And your proposal was that you would offer this buyout in exchange for $100,000, correct?
A. That's correct.
Q. And this wasn't just a license, right? It was --
 It was an assignment of all rights of ownership, correct?
A. That's correct.
Q. Okay. There were a few exceptions that you identified here. You wanted to maintain the

Page 189

CONFIDENTIAL

right to use the photographs for books and editorial purposes, limited edition fine art prints, right?
A. Right; that's correct.
Q. And you also wanted a 10 percent royalty against fees collected by ABG from authorized licensees for advertising and advertising campaigns, correct?
A. That's correct.
Q. Okay. And you explain here how that royalty would work?
A. That's right.
Q. Okay. So, how did you come out with this figure of $100,000 for the buyout? I -- assignments, not just licenses, but assignments of all ownership rights in all of those photographs subject to the limitations we just discussed?
A. Well, I looked at it like I couldn't do anything with them for advertising with them, for one. I couldn't -- they could without going through them. I couldn't do anything with merchandising. They owned all of the -- the rights to that, and I could still retain work for editorial books, exhibitions, fine art prints. So, I looked at it, like it might work out for both of us.

Page 190

CONFIDENTIAL

Q. Okay. Because your own ability to use the photographs was limited, right; by the fact that you don't control Muhammad Ali's rights of publicity, correct?
A. Wait, say that again.
Q. Your own ability to use the photographs was limited by the fact that you don't control Muhammad Ali's rights of publicity, correct?
A. Not so much for publicity, but for products and merchandise.
Q. Okay. So, in other words, you can't use the photographs in connection with products, merchandise, advertising, right, without --
A. Permission.
Q. -- without permission?
A. Without Agreement permission from them.
Q. With a permission from MAE, correct?
A. That's correct.
Q. Okay.
A. That's correct.
Q. And so --
A. In fact, when I have an exhibition, I have to be very careful that its Michael Gaffney photographs of Muhammad Ali, or The Champ Muhammad

Case 1:18-cv-08770-GBD-OTW   Document 233-8   Filed 01/12/24   Page 8 of 11

Deposition of Michael Gaffney                                Michael Gaffney v. Muhammad Ali Enterprises, LLC, et. al.

Page 191

CONFIDENTIAL

Ali, but I can't use advertising of Ali's name unless it's connected to an exhibition. I can't use it for anything else.
 Q. Okay. But if MAE controls rights in the photographs, they don't need any further permission, right? Because they --
   They already have the permission to use the photographs in connection with merchandise, or products, or advertising, correct?
 A. During the term of my contract; yeah.
 Q. Okay.
 A. During the term of the contract. Like I said before, there's a beginning, there's an end.
 Q. Right. And so --
   So, in other words --
   So, let me ask a different question.
   So, how did you come up with the $100,000-figure there?
 A. It sounded --
   It sounded like it might be engaging for them.
 Q. Okay.
 A. It might be attractive for them to have the Collection available.

Page 192

CONFIDENTIAL

 Q. Okay.
 A. You know, you're --
   You know, there's a --
   Go ahead.
 Q. So, at the time, you thought that this was a good deal for you, right?
 A. Yeah, I wouldn't have offered it if I didn't think it was a good deal for me.
 Q. Right.
   MS. RUTHERFORD: Okay. Can we look at the document Bates numbered 156 to 158, please, and can I have control, please.
 Q. Do you recognize this document?
 A. Yes, I do.
 Q. What is it?
 A. That's the --
   The second letter. The second email to Jasen Wright, and I'm not quite sure if he ever responded to the first one, and so I -- I offered up a -- another, I guess another -- another inducement and that was February 11th. It was -- we're now passed the -- the contract had expired already.
 Q. Okay. And what is your offer in this --

Page 193

CONFIDENTIAL

   You offered two different options, correct; Option A and Option B?
 A. I guess, yeah.
 Q. Okay. And Option A, again, involves the buyout for $100,000, and Option B is a photo use fee of $50,000 for the entire Michael Gaffney Collection for the term of four years, and then you wanted some changes to the compensation provisions, correct?
 A. Right.
   (Simultaneous
   speaking.)
 Q. The -- the right --
   (Simultaneous
   speaking.)
 Q. -- provisions, correct?
 A. Right.
 Q. Okay. You asked for a present in the 5.1.1, in the royalty percentage, you wanted to increase it from 30 percent to 50 present?
 A. Okay.
 Q. And what do you expect to have from 5.1.1 to 5.1.2?
 A. If they negotiate --
   If they wanted to use the photographs in

Page 194

CONFIDENTIAL

an advertisement, the fee would be negotiated.
 Q. Okay. So, that was --
   There was no change to that? That's the same as the original 5.1.2?
 A. That's in the original --
   No, not really. It's --
   It's different. I asked for 10 percent on the advertising in the first offer and on this one, but I reverted back into the contract, what's existing in the contract --
 Q. Okay.
 A. -- which is negotiation for an endorsement of goods or services.
 Q. Got it. But you didn't request any change to 5.2 with respect to marketing and promotional purpose use, correct?
 A. No, that was not --
   That was not considered an issue, because that was for the terms and conditions of the contract.
 Q. Right. In other words, you didn't want to change the terms and conditions of the original contract with respect to compensation or lack thereof for marketing and promotional purposes?

Case 1:18-cv-08770-GBD-OTW  Document 233-8  Filed 01/12/24  Page 9 of 11

Deposition of Michael Gaffney                                    Michael Gaffney v. Muhammad Ali Enterprises, LLC, et. al.

Page 227

CONFIDENTIAL
 Thank you.
 Okay. And can we scroll down to the bottom.
 Thank you.
Q. Okay. This --
 This is one of your images, correct?
A. Yes, it is.
Q. Okay. And this is a screenshot of -- of ABG's Muhammad Ali verified social media site on --
 MS. RUTHERFORD: Excuse me, can you just scroll up, please.
Q. Okay. This is a screenshot of Muhammad Ali's verified social media site, correct?
A. That's what it says, "MAE/ABG," I don't know if that's the verified site.
Q. Where are you looking?
A. On the top here.
 MS. RUTHERFORD: Andrew, can you scroll down.
 We're going to mark this with the next exhibit number, please.
 (Whereupon, Document 877 was marked as Exhibit 20 for

Page 228

CONFIDENTIAL
 identification, as of November 20th, 2020.)
Q. All right. So, that number down here, "MG-ABG/MAE0087," indicates that the document was produced by you -- by your attorneys to us.
 Have you ever seen this document before?
A. No.
Q. Okay. Do you know who created it?
A. Who created it? I don't know. It looks like my son and 88,000 others liked it. I have no idea where the image came from; is that the question? Do I know who created it? I created the image.
Q. No, I'm asking who created this document; where the document came from.
A. Where this document came from?
Q. Yes.
A. That we're looking at right now?
Q. Yes.
A. Not the --
 Not the image, but who created the document, you're saying?
Q. Correct.
A. I don't know.

Page 229

CONFIDENTIAL
Q. Okay. But you recognize that this is your son Ian Gaffney liking the photo, correct?
A. Yeah. I don't know how social media works, but it looks like you can share any photograph. So, I don't know where he shared it from or where he got it, but it was shared along with 88,000 others, it looks like.
Q. Okay. Let's look at document number.
 Sorry, did your son ever appropriate to you that he saw your photographs on social media?
 MR. ALLEN: Jessica, as to what time?
Q. Ever.
A. That he --
 He's a big promoter of mine. I love the kid, but was I aware that he was doing this? I -- I probably saw it. So, was I aware of -- of everything he posts on the Internet? No; on social media? No, I'm not, but it looks like he posted this, and I don't know where he got it from. He might have been reposting it from somewhere.
Q. Okay. But he never mentioned it to you; is that what you're saying, or did he?
A. No, he didn't mention it.

Page 230

CONFIDENTIAL
Q. Did anybody else ever mention to you that they've seen your photos on social media?
A. No, not really. I mean, you know, if I was having a show, like I -- I put that stuff on there and, you know, do stuff along those lines, but people would acknowledge, you know, if I was having a show, an exhibition somewhere, but --
Q. Okay.
A. -- as far as posting of pictures, no, he didn't say anything to me.
Q. Okay.
 MS. RUTHERFORD: Can we look at document number 782, please.
Q. Okay. And you can see here, there's another -- it looks like a social media post, and it looks like down here Ian Gaffney liked this one as well; do you see that?
A. Right.
Q. Okay.
A. These are --
 Kathy Hyra, I know. She's Debbie's sister. Anyway --
Q. Did either of those people mention to you that they saw this --

Case 1:18-cv-08770-GBD-OTW   Document 233-8   Filed 01/12/24   Page 10 of 11

Deposition of Michael Gaffney                                    Michael Gaffney v. Muhammad Ali Enterprises, LLC, et. al.

Page 235

1  CONFIDENTIAL
2  it's even close.
3    Q.  Okay.
4    A.  You have better records than I do of that.
5    MS. RUTHERFORD:  Can we look at
6  document 1652, please.
7    THE WITNESS:  You did say 1652,
8  right?
9    MS. RUTHERFORD:  That's it.  That's
10 the number of the document.  So, an
11 Excel spreadsheet --
12   And can you make it bigger, so we
13 can see the numbers there.
14   THE WITNESS:  Yeah, I can see it.
15   MS. RUTHERFORD:  Wow, you have
16 better eyesight than I do.
17   THE WITNESS:  Well, I have glasses
18 on, too, so --
19   MS. RUTHERFORD:  Okay.
20   Andrew, can you make that a little
21 bit bigger, so that we can see it?
22   THE VIDEOGRAPHER:  It's not letting
23 me enlarge it.  Okay.  It's not letting
24 me manipulate the document.
25   MS. RUTHERFORD:  Maybe if you turn

Page 236

1  CONFIDENTIAL
2  it into a PDF; that did the trick last
3  time.
4    Q.  Okay.  Mr. Gaffney, I'm looking at --
5    This was a document produced by ABG, and
6  it shows the payment history to you for licensing of
7  your photographs.
8    A.  Right.
9    Q.  And you see this column that says:
10   "Submitted/paid to Gaffney," right?  And
11 the total is $279.12; do you see that?
12   A.  Yes.
13   Q.  And then it actually includes an
14 overpayment of $43.07, right?
15   A.  Okay.
16   Q.  This is all the payments made to you
17 quarterly, paid to the --
18   A.  It's not all the payments; you missed
19 2011, 2012.
20   Q.  Right.  It's just 2013 through Q3 of 2018,
21 right?
22   A.  Right.
23   Q.  Okay.  And did you receive all these
24 payments?
25   A.  Yes.

Page 237

1  CONFIDENTIAL
2    Q.  Okay.  And the last payment you received
3  was in 2018, correct?
4    A.  Fifty-four cents.
5    Q.  $5.53.  $4.53.
6    A.  Okay.  I guess.
7    Q.  In other words, ABG continued to pay you,
8  at least it is shown here, through 2018, correct;
9  for your licensing --
10       (Simultaneous
11        speaking.)
12   A.  I don't know if they've continued to pay
13 me.
14   Q.  I'm sorry?
15   A.  Where's you --
16   The rest of 2018 and 2019 and 2020, I
17 didn't receive anything.
18   Q.  This only goes through Q3 of 2018, right?
19   A.  Right.
20   Q.  But the royalties are sort of dropping
21 off.  So, $4.53 in Q1 of 2018; this just doesn't
22 show any royalties that were even actually due to
23 you beyond that.
24   A.  Well, I don't know that -- what was due to
25 me.  I haven't received anything.

Page 238

1  CONFIDENTIAL
2    Q.  Okay.
3    MS. RUTHERFORD:  And we can take
4  that down.
5    Q.  And how much money have you generated from
6  your use of the photos, Mr. Gaffney?
7    A.  Since I started exhibiting?  Ballpark,
8  $30,000, roughly.
9    Q.  Okay.  And that's from the sale of the
10 prints and the sale of your book, correct?
11   A.  Yes; mh-hm.
12   Q.  Would it include anything else?
13   A.  Well, I mean, sale of prints, but it's
14 also use in films, television, and I did, around the
15 time, especially when Mr. Ali passed away, there was
16 a lot of activity in this paperwork, a lot of
17 newspaper work, Internet, Time Magazine, so --
18   Q.  Okay.  And so we asked for copies of all
19 licenses and agreements that you made with respect
20 to the photos and you we received many documents.
21   I'm just going to ask you, did you search
22 for those documents?
23   A.  Yes.
24   Q.  And did you produce?
25   A.  Uh-huh.

Case 1:18-cv-08770-GBD-OTW   Document 233-8   Filed 01/12/24   Page 11 of 11

Deposition of Michael Gaffney                                       Michael Gaffney v. Muhammad Ali Enterprises, LLC, et. al.

Page 251

CONFIDENTIAL

upon any expiration or termination of the Agreement, MAE may continue to exercise the license rights granted to it in Paragraph 1.1 with respect to all licenses and/or agreements made prior to the date of termination."
   Is that your understanding?
   A. Yes.
   Q. Is it your understanding that this doesn't cover anything other than licenses and --
        (Simultaneous
        speaking.)
   A. That was --
   Q. -- that would be covered in Paragraph 1.1?
   A. It covers only the terms and the conditions of the existing contract -- of the contract that was signed. Anything after that --
        (Simultaneous
        speaking.)
   Q. -- went to --
   It seems to indicate:
   "All lines and agreements will continue to exercise license rights," and my question for you is, is it your understanding that that includes only 1.1.2, or in your mind, does it also include the

Page 252

CONFIDENTIAL

promotional and marketing purposes in 1.1.2?
   A. It provides the terms and conditions of the contract.
   Q. All right.
   A. Of --
   Q. Can we go --
        (Simultaneous
        speaking.)
   A. -- of products and services. Let me finish that.
   Q. Okay. So, you're saying that it's your understanding that that provision of 10.2 covers licenses for products and services?
   A. Yeah, it --
   And agreements made prior to the date of termination.
   Q. Right.
   A. Agreements made prior to the termination date.
   Q. All right.
   A. That would be -- okay.
   MR. ALLEN: Can we go to -- I think it's --
   I think it's either Exhibit 14 or

Page 253

CONFIDENTIAL

15. Let's do 15.
   THE WITNESS: Oops, you have to bring it down.
   Q. So, pursuant to this letter that you had sent --
   A. Wait a minute. I'm not on the same page. I'm on Jasen Wright here.
   Q. Yes.
   MR. ALLEN: This is Exhibit 15.
   Q. This is an email that you had sent to Jasen Wright.
   A. Okay. All right.
   Q. And you were making an offer to him to enter into a new deal; is that correct?
   A. Yes; that's correct.
   Q. Was this offer ever accepted?
   A. No, in fact --
   In fact, it -- it --
   He never agreed to it. I never agreed to it, and we got to a bargaining position where he said, "Look, we're going to keep the old contract. Take it or leave it."
   And I said, "I'm leaving it. I'm done."
   And that was --

Page 254

CONFIDENTIAL

   That was when I sent him the -- that termination email, which forbid them from continuing to use the photographs.
   Q. I see.
   A. Right.
   Q. Was that Exhibit 16?
   MR. ALLEN: Can we put up 16.
   A. That was March 4th, 2015.
   MR. ALLEN: Can we please put up Exhibit 16.
   Q. Is this --
   No, is that the wrong exhibit?
   A. That's not it.
   Q. Oh, it's Exhibit 19. Is this it?
   A. That's it. Yup. That was after our discussion that went on for, I guess a month and a half, and then finally, I wound up calling them and saying, "you haven't gotten back to me. What are you going to do?"
   And he said, "well, we're just not going to do anything with your offer, but we'd like you to sign the old contract and go with that."
   And I said, "absolutely not. I'm done."
   And then shortly after, within a couple of