# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *MICHAEL GAFFNEY,* | |
| Plaintiff, | |
| v. | Case Nos.  1:18-CV-08770 |
| | 1:20-CV-07113 |
| *MUHAMMAD ALI ENTERPRISES LLC,* *a New York Limited Liability* *Company; AUTHENTIC BRANDS* *GROUP LLC, a New York Limited* *Liability Company; ROOTS OF, INC.,* *a California corporation d/b/a* *"ROOTS OF FIGHT;"* *and DOES 1-10,* | Judge: Hon. George B. Daniels Magistrate: Hon. Ona T. Wang |
| Defendants. | |

**<u>PRELIMINARY EXPERT REPORT OF PROFESSOR JEFFREY SEDLIK</u>**

Submitted June 30, 2021

CONFIDENTIAL

I have been engaged by plaintiff Michael Gaffney ("Gaffney") in the above-referenced matters ("Matters") brought by Gaffney against defendants Muhammad Ali Enterprises LLC ("MAE"), Authentic Brands Group LLC ("ABG"), and Roots of, Inc.  ("ROF") d/b/a "Roots of Fight," (collectively, "Defendants") to provide expert testimony as set forth below.

I have been asked by Gaffney to provide expert opinions on practices, standards, and procedures in the photography and advertising industries, both in general and with respect to business transactions, actions and other occurrences involving or related to the parties in the Matters. Gaffney also requested that I opine on copyright registration issues and workflows, contractual issues, image licensing issues, applicable damages, and other issues that have arisen or are likely to arise in the Matters. I have also been asked to rebut any opinions expressed by Defendants' experts.

My opinions are based in part on more than 25 years of service in high-level positions in trade associations and standard-setting bodies in the photography, advertising, product marketing, technology, and design industries. I have been an internationally recognized advertising photographer for more than 30 years, working with many clients, observing and interacting with large numbers of professional photographers, advertising agencies, design firms, corporate clients, stock photography agencies, product manufacturers, and others in the United States and abroad. I have served as Project Manager in projects involving the development, operation, and maintenance of websites, web applications, and other applications. I have also owned and operated a publishing company, producing and selling photography-related products for more than 20 years.

In addition to my personal knowledge, my opinions are based on an independent examination of documents and materials produced in the Matter to date. Should additional relevant information become available, I respectfully reserve the right to amend or supplement my opinions as necessary.

This Expert Report ("Report") has been prepared in connection with the above-referenced Matter. Section VI of the Report outlines my opinions.

If called upon as a witness in this Matter, I could and would provide the following testimony.

## I.   QUALIFICATIONS

I currently serve as the President and CEO of the PLUS Coalition. "PLUS" is an acronym for "Picture Licensing Universal System." The PLUS Coalition is a non-profit, international standards body and trade association representing the shared business interests of all industries involved in the creation, licensing, and use of photography and illustration, including photographers, illustrators, advertisers, advertising agencies, graphic design studios, publishers, artists' representatives, museums, libraries, stock photo agencies, and all other photography licensees and licensors. The PLUS Coalition develops, propagates, and maintains universal standards for use by licensees and licensors in transactions involving photography. As a founding member of the PLUS Board of Directors, I developed the core concept of the Coalition and its copyright licensing standards.

I am the past National President of the Advertising Photographers of America ("APA"), the leading trade association for commercial photographers in the United States. I also served APA as Chief National Advisor on Licensing and Copyright, and provided leadership level guidance on topics including copyright, photography, advertising, industry standards, contract terms, model release terms, and business practices. I represented the APA in discussions with the United States Copyright Office and worked with organizations around the world to develop and maintain standards for licensing terms, licensing agreements, model releases, and other photography-related business matters. On a local basis, I also served on the Board of Directors and Legal Affairs Committee of the Los Angeles Chapter of the APA, and as Chairman of the Model Release Working Group, charged with developing

international standards for model releases, communication of usage rights, and model release workflow.

I currently serve on the Photo Metadata Working Group for the International Press Telecommunications Council ("IPTC"), the global standards body for photography metadata. In the past, I have served on the Digital Image Submission Guidelines Working Group for Universal Digital Image Guidelines ("UPDIG"), and as an "Invited Expert" on the Permissions and Obligations Working Group of the World Wide Web Consortium ("W3C"). Until November 2019, I served as a Director of the American Society for Collective Rights Licensing ("ASCRL"), a collective management organization for the visual arts. I also serve as a legal and legislative advisor to the American Society of Media Photographers ("ASMP"), and as a member of the ASMP Copyright Speakers Bureau. I authored the "Photography Licensing" chapter of "*ASMP Professional Business Practices in Photography*," the predominant business operations reference for professional photographers.

I am a frequent speaker at copyright events hosted by the United States Copyright Office, the United States Patent Office, and the United States Department of Commerce. At the request of the Register of Copyrights, I served as a guest instructor at Stanford Law School in conjunction with a United States Copyright Office-sponsored Copyright Practicum. I have been engaged by the United States Copyright Office to train new Registration Examiners on visual art copyright registration issues from 2010 to present.

I have been a faculty member of the American Law Institute for Continuing Legal Education events, providing instruction on licensing practices and on the practical application of copyright law in the visual arts. I have been a guest speaker and guest instructor on copyright law and licensing for leading institutions and organizations, including Duke University School of Law, New York University School of Law, Oxford University School of Law, American University Washington College of Law, Antonin Scalia George Mason University Law School, Fordham University School of Law, Joint Photographic Experts Group (JPEG), International Federation of Reproduction Rights Organizations, Smithsonian Institution, International

Confederation of Societies of Authors and Composers, National Association of Recording Merchandisers, Digital Library Federation, the Copyright Society of the United States, and others.

In addition, I have testified repeatedly before the Judiciary Committees of both the United States Senate and House of Representatives, summoned to advise Congress on copyright law issues and legislative reform. I work closely with legislators, stakeholder groups, and the United States Copyright Office on legislation, regulations, and policy issues related to copyright protections, registration, and remedies. I have assisted legislators and government agencies in drafting and revising federal copyright legislation. I am an active participant in the Copyright Alliance, serving on the Creators Advisory Board, Academic Advisory Board, and the United States Copyright Office Modernization Working Group.

In addition to my work in the United States, I serve on the Advisory Board of the Beijing Intellectual Property Expertise Center of Judicature, a governmental agency overseeing copyright matters before the People's Court of China. I also serve as a founding Director of the Linked Content Coalition ("LCC"), a global non-profit organization dedicated to facilitating and expanding the legitimate use of content through interoperable identifiers and metadata. I have also been a partner in the Rights Data Integration initiative, a European Commission project focusing on the integration of systems that manage and trade intellectual property rights online across all types of content, usage, and media. I was a partner in the Copyright Hub initiative in the United Kingdom, and a participant in the European Commission's Metadata Image Library Exploitation project. I was a partner in the Initiative for a Competitive Online Marketplace, based in Vienna, Austria, and have been an invited speaker on intellectual property law at the House of Lords of the Parliament of the United Kingdom.

Adobe Systems, creator of Photoshop and other digital image and design software, selected me to be a member of its "Prerelease Team" and its "Adobe Photographers' Council," a group of twelve leading photographers who advise the company on trends in digital photography and the photography industry at large.

4

Selected honors include the 2005 Industry Leadership Award from the International Photography Council of the United Nations, the 2006 PhotoMedia Photographer of the Year award, the 2007 APA Industry Advocacy Award, and in 2008, a "Lifetime Achievement Award," and honorary Master's Degree from the Brooks Institute of Photography, recognizing "Mastery of the Craft and Business of Photography."

I am a long-time faculty member and Professor at the Art Center College of Design in Los Angeles, where I sit on the Intellectual Property Committee and teach advanced courses on the artistic, technical, production, legal, and business aspects of traditional and digital photography. My curriculum includes advanced instruction on legal topics such as copyright law, copyright registration, copyright licensing, and contract interpretation. Technical topics include digital techniques and advanced lighting for photography of people, products, and automobiles. I also provide instruction on advertising, marketing, branding, and consumer behavior.

After more than 30 years as an award-winning commercial photographer and studio owner, I continue to operate an advertising and entertainment photography production company in California, with a client list that includes such companies as Nike, Federal Express, Farmers Insurance, SBC, GTE, NBC, Sony, AT&T, Blue Cross, Epson, IKEA, United Airlines, Warner Brothers, Toyota, Nestlé, Disney, Bank of America, and others. My publishing company, Mason Editions, produces and distributes fine photographic reproductions.

I frequently provide forensic image analysis in civil and criminal matters, and provide consulting services to organizations and individuals on issues related to copyright, licensing, negotiating, and business practices and procedures related to photography, advertising, and modeling. I have testified as an expert witness during the period 2002 to present, in litigation involving photography, illustration, product design, copyright, metadata, advertising, branding, graphic design, right of publicity/privacy, model releases, breach of contract, criminal matters, and other topics. Matters in which I have provided testimony within the last four years are:

*EVOX Productions, LLC v. KAYAK Software Corporation*
United States District Court, Central District of California, Western Division
Case # CV15-05053-PSG (AGR)

*Under-A-Foot Plant, Co. v. Exterior Design, Inc.*
United States District Court, District of Maryland
Case # BPG-15-871

*Sustainable Sourcing, LLC v. Brandstorm, Inc. et al.*
United States District Court, District of Massachusetts, Western Division
Case # 12-CV-30093

*Dana Ruth Lixenberg v. Bioworld Merchandising, Inc. et al.*
United States District Court, Central District of California
Case # 2:15-cv-07242 MWF-MRW

Capri Krakana, Johan Krakana
Arizona Superior Court, Maricopa County
Case #JSS18301

*Osram Sylvania v. Photographic Illustrator Corporation v Brooks Electrical, et al.*
American Arbitration Association
Case # 01-16-0000-2652

Capri Krakana, Johan Krakana
United States Superior Court of the State of Arizona, County of Maricopa
Case # FC2016-050246

*Nelson Araujo, et al. v. City of San Jacinto, et al.*
Superior Court of California, Riverside County
Case # RIC1411590

*Laspata Decaro Studio Corporation v. Rimowa GmbH et al.*
United States District Court, Southern District of New York
Case # 16-cv-00934-LGS

*Glen Craig v. UMG Recordings, Inc. et al.*
United States District Court, Southern District of New York
Case # 16 Civ. 5439 (JPO)

*Brittney Gobble Photography, LLC v. WENN Limited et al.*
United States District Court, Eastern District of Tennessee, Knoxville Division
Case # 3:16-cv-00306

*The Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith et al.*
United States District Court, Southern District of New York
Case # 1:17cv2532

*Jason Putsche v. Alley Cat Allies, Inc.*
United States District Court, Southern District of Maryland
Case # 8:17-cv-00255-PWG

*Yves Michel Fontaine v. MMLery LLC, 61-73 Ellwood, LLC, 533 41st Street*
Realty, LLC and Sharp Management Corp.
Supreme Court of the State of New York, County of Kings
Case # 6580/12

*Brittney Gobble Photography, LLC v. Sinclair Broadcast Group, Inc., et al.*
United States District Court, District of Maryland, Baltimore Division
Case # 1:18-cv-03403-RDB

*D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*
United States District Court, District of New Hampshire
Case # 1:17-CV-000747-LM

*Annette Navarro McCall v. The Procter and Gamble Company*
United States District Court, Southern District of Ohio, Western Division
Case # 1:17-cv-00406-TSB

*Optimum Imaging Technologies LLC v. Canon, Inc.*
United States District Court, Eastern District of Texas, Marshall Division
Case # 2:19-CV-246-JRG

*Intersal, Inc., v. Susi H. Hamilton*, Secretary, North Carolina Department of Natural and Cultural Resources, in Her Official Capacity, North Carolina Department of Natural and Cultural Resources, and State of North Carolina
General Court of Justice, Superior Court Division, North Carolina, Wake County
Case # 115 CVS 9995

*Cora Skinner et al., v. Red Tape, Inc,* d/b/a Stiletto's & Red Tape VI, Inc., d/b/a Stiletto's
United States District Court, Southern District of Texas, Brownsville Division
Case # 1:19-cv-186

*Mireya Rios v. Fekkai Retail, LLC, Blue Mistral, LLC*
United States District Court, Central District of California
Case # 2:20-cv-08743-PA-MRW

*Evox Productions LLC v. AOL, Inc. Oath, Inc., and Verizon Media, Inc.*
United States District Court, Central District of California, Western Division
Case # 2:20-cv-02907-JWH-JEM

My publication list is included in my curriculum vitae, a copy of which is attached to the Report as *Curriculum Vitae* (Exhibit A).

## II.    COMPENSATION

My work on the Matter is billed at $650 per hour. My compensation is not
contingent upon, dependent upon, or related in any way to the outcome of the
Matters.

## III.    MATERIALS CONSIDERED

In preparation for the Report and for the expert testimony that I may be called on
to provide, I have considered the materials listed in *Materials Considered* (Exhibit
B).

## IV.    ASSUMPTIONS

Retaining counsel instructed that I rely on the following assumption in forming my
opinions in the Matter. As the scope of my engagement does not at this time include
verification of the accuracy of the assumption, my reliance on the below-listed
assumption does not reflect a lack of rigor in the formation of my opinions. If the
assumption is determined to be incorrect, I may revise my opinions. If later asked
by retaining counsel to verify the accuracy of the assumption, I will do so where
possible. I have been instructed to assume that:

A.  The Information in the Table of Photographs (Exhibit E) and Table of Usages
    (Exhibit D) and ancillary Exhibits G, H, and I is correct.

B.  Gaffney owns copyright in the Photographs.

## V.   BACKGROUND

Michael Gaffney is a photographer, photojournalist and visual artist who began his career as a news photographer in 1972. Gaffney photographed Muhammad Ali during 1977 and 1978.[1]

Authentic Brands Group LLC, is a brand development, marketing and entertainment company.[2]

Muhammad Ali Enterprises LLC, is a wholly-owned subsidiary of ABG.[3]

Roots of, Inc. does business as "Roots Of Fight" a media, lifestyle and apparel brand [4] that advertises, sells and distributes apparel worldwide.[5]

Gaffney created photographs of Muhammad Ali during the period 1977 to 1978. In 2011, Gaffney and MAE entered an agreement ("2011 Agreement") under which Gaffney granted MAE the right to use and sublicense photographs identified in Exhibit A to that agreement. In 2014, ABG acquired MAE, and  Gaffney and ABG entered an agreement ("2014 Agreement") under which ABG received rights to use and sublicense the photographs identified in Exhibit A to that agreement. On expiration of the 2014 Agreement, Gaffney provided notice of termination to ABG, in a letter dated March 4, 2015. ABG and its affiliates continued to make use of the photographs after the expiration and termination of the agreement. When Gaffney and Defendants were unable to resolve their differences, Gaffney filed a complaint on September 25, 2018, alleging copyright infringement and other claims.[6] Gaffney then filed a second complaint on September 1, 2020, alleging infringement and

---

[1] Second Amended Complaint, *Gaffney v. Muhammad Ali Enterprises LLC et al,* No.1:18-cv-08770 (S.D.N.Y., filed Sept. 25, 2018) ("SAC")
[2] Authentic Brands Group LLC, https://www.authenticbrands.com/about
[3] *See* SAC.
[4] Roots Of Flight, https://www.rootsoffight.com/pages/about-us
[5]*See* SAC*.*
[6] *Gaffney v. Muhammad Ali Enterprises LLC et al,* No.1:18-cv-08770 (S.D.N.Y., filed Sept. 25, 2018) ("Original Complaint"), superseded by SAC.

other claims in relation to three additional photographs.[7]

## VI. DISCUSSION

### A.    The Business Model for Professional Photographers

Photographers serving the business-to-business marketplace typically retain copyright ownership of the copyrights in the photographs they create. For most photographers, the compensation derived from the creation of a photograph (often expressed as a "Creative Fee" or "Photographer's Fee") is insufficient to operate a sustainable business. Leveraging their exclusive rights under copyright law, photographers typically require compensation not only for the creation of a photograph, but also require a "Usage Fee" or "License Fee" in exchange for granting a client the right to exploit the photographer's copyright in the photograph.[8]

When photographers accept assignments to create images, they typically grant their clients limited rights at first with the expectation and intention that those clients will later return to purchase licenses for additional uses and for additional periods of use. These "Rights Managed" ("RM") licenses require a license fee based primarily on the scope of the rights granted. In RM licensing, the greater the scope of usage desired, the greater the licensing fee required of the client. The scope of use permitted under RM licenses spans the full spectrum, from very narrow to very broad.

The license scope is defined generally by the media in which the photographs may be reproduced, distributed, and displayed, subject to temporal and geographic limitations. The license is more specifically defined by limitations

---

[7] *Gaffney v. Muhammad Ali Enterprises LLC et al,* No. 1-20-cv-07113-1) filed September 1, 2020) ("Complaint - 3 Images")

[8] While some photographers may elect to only specify a "Photographer's Fee" on their estimates and invoices, such photographers typically contemplate the client's scope of use of the photographs when determining the amount of that single fee, which combines compensation both for the creation and use of the photographs.

on versions, placements, size, quantity, languages, and industries in which the photograph may be reproduced, distributed, displayed, and transformed.

Under the photographer's business model, the photographer assumes significant risk, as a client may never return to license additional rights. To mitigate that risk, photographers typically make a special effort to create photographs that exceed their client's expectations and deliver maximum value to their client's business. This practice is intended to maximize secondary licensing revenues, allowing photographers to fully monetize their copyrights. Clients benefit as well, at first paying only for the rights they need, and then later acquiring additional rights on an ad hoc basis, spreading licensing revenues across budget periods, and avoiding the advance purchase of rights they may never need. As a result, the RM licensing model serves photographers and their clients well.

Photographers often also engage in licensing such images to parties other than the commissioning client, throughout the copyright life of the images. A long-standing rights model, RM licensing is the most common form of licensing in the assignment marketplace.

In the alternative, photographers may agree to assign copyright ownership to their clients, or may agree to create works under work-made-for-hire terms, whereby copyright ownership vests with the commissioning client upon creation.

B.    **General Background: Secondary Licensing of Photography Copyrights**

In addition to commissioning photography under the Rights Managed model for commercial assignment photography as discussed in Section A above, clients may acquire rights to existing images ("stock images").

Photographers often create stock images independently and speculatively, and then offer these existing images for licensed usage by clients. This offering is typically made on stock image websites, either by the

12

photographer or by a "stock agency" acting as an authorized licensor of the photographer's images.

Clients seeking stock images typically visit stock image websites, search for images meeting their requirements, and then purchase licenses and download the images for usage. Such purchases may be made via an automated process, or by communicating with sales staff at stock agencies or photographers' studios.

Clients may acquire rights to stock images under various licensing models. While some vendors specialize in certain licensing models, many vendors offer images under several different licensing models. Common stock image licensing models include:

(1) Rights Managed Stock Licensing ("RM"): RM remains a common form of stock image licensing. As described above, usage fees for RM licenses are based not on file size, but upon the scope of usage desired by the client. While the majority of RM images are created by professional photographers, RM images are also created by semi-professionals, amateurs, and enthusiasts. Fees associated with RM licenses are typically higher than fees for Royalty Free licenses.

(2) Royalty Free Stock Licensing ("RF"): This model allows a client to pay a single, one-time fee, typically based on the size of the digital image file desired by the client. The client receives a license allowing broad usage of the image — typically in unlimited media, for an unlimited period of time, at any size, in any quantities, worldwide, for nearly any purpose, including but not limited to the promotion of products and services. For example, such a license may allow a client to use an image on any number of websites in any and all countries, worldwide, forever. There may be any number of detailed restrictions on RF licenses, but in general, the licenses allow broad usage. The RF licensing marketplace includes images created by professionals,

semi-professionals, amateurs, and enthusiasts. RF images are typically less unique than images offered under the Rights Managed model (see below). Individual photographers do not offer RF licensing directly to clients.[9] Photographers instead contribute images to stock photo agencies, who serve as intermediaries to licensees. For this reason, the RF variants described below are inapplicable to transactions between individual photographers and end-users of photographs.

(3) Microstock: A variant of RF licensing, microstock is typically a less expensive alternative. Like RF, microstock licenses provide broad rights for a low price, based on the size of the image file desired by the client. Like RF, microstock licenses include restrictions, but typically permit usage in unlimited media, unlimited quantities, unlimited sizes, and unlimited countries, for an unlimited period of time. Microstock agencies offer images created by professionals, semi-professionals, amateurs, and enthusiasts.

(4) Subscription: An increasingly popular RF licensing variant, subscription-based licensing allows clients to pay a monthly or annual subscription fee in exchange for a broad license permitting the download of a quantity of images during each subscription period — per year, per month, or per day. Such licensors typically employ a system of graduated pricing tiers under which clients pay an amount commensurate with a maximum quantity of images available for downloading during the subscription period. There are many variants on subscription licensing schemes, driven by competitive pressures. Subscription agencies offer images created by professionals, semi-professionals, amateurs, and enthusiasts.

(5) New Models: Seeking to maximize profitability and sales, stock agencies have been experimenting with new, hybrid models, such as

---

[9] Rare exceptions may exist.

licenses requiring payment based on the quantity of viewers of images published online, or payment for advertising placement in or on an image published online. The market continues to evolve.

The above is a limited overview of photography licensing models, and is not intended to serve as a comprehensive description of all practices related to copyright licensing in the photography industry. Exceptions exist. For example, an enthusiast, amateur, semi-professional or professional may license images under any of the licensing models described above.

Based upon my review of the documents, materials and testimony available to me in this matter, and with a reasonable degree of certainty, the license granted by Gaffney to Defendants under the Agreement is consistent with the RM licensing model. Both the temporal limitation of the license agreement and the provision for royalties applicable to each usage are entirely consistent with rights managed licensing practice, in which the license fee is determined in greatest measure by the scope of use of the licensed works.

My opinions on photography licensing models are based on my personal knowledge and experience as a professional photographer and photography trade association leader charged with establishing and developing industry standards and associated photography licensing terms and agreements.

## C.    The Photographer

Photographer Michael Gaffney operated a corporate location photography business in New Jersey for 35 years. His photographs of Muhammad Ali have been published and displayed in magazines, books, films. museums and gallery exhibitions.

## D.    The Photographs

Gaffney alleges that the Gaffney photographs of Muhammad Ali were used by Defendants without license or authorization after termination of the 2011

License Agreement on January 14, 2015 and after Defendants received termination notice from Gaffney on March 4, 2015. The Photographs are identified in Table of Photographs (Exhibit E) and Visual Index of Photographs (Exhibit C).

### E.    Gaffney's Right to License the Photographs

As the creator and copyright owner of the Photographs,[10] Gaffney may offer and sell copyright licenses to clients throughout the world. In certain states and countries, Gaffney's licensees may be required by law to request and secure permission from Muhammad Ali's designated representatives in order to make certain types of usages of Muhammad Ali's likeness as depicted in the Photographs. These permissions are the responsibility of the licensee, not Gaffney, and do not constrain Gaffney's right to license his copyrights in the Photographs.

### F.    The 2011 Agreement

I have reviewed the 2011 Agreement. Based on my experience as a professional photographer and based on my more than thirty years of participation in and leadership of standards setting activities for agreements employed in the licensing of photographs, the license granted by Gaffney to Defendants did not permit Defendants to continue to make use of the Photographs after expiration, with the exception of selling off products manufactured prior to January 31, 2015, the date on which the 2011 Agreement expired. Any other reproduction, distribution, public display, or creation of derivatives of that Photographs by Defendants or its affiliates was not permitted by the license and not authorized by Gaffney.

### G.    Defendants' Obligations on Expiration of the 2011 Agreement

By custom and practice in the photography licensing industries, upon expiration of the 2011 Agreement term, Defendants were obligated to take

---

[10] Assumption B

16

necessary actions to prevent further reproduction, distribution, public display, and creation of derivative works of the copies of the Photographs then in the possession of, or under the control of Defendants, its vendors, partners, customers and affiliates.

**H.    Defendants Did Not Fulfill Defendants' Obligations on Expiration of the 2011 Agreement**

Defendants did not take necessary action to halt the public display, public distribution, reproduction and creation of derivatives of the Photographs. As a result of Defendants' failure to perform its obligations, Defendants and their affiliates and customers continued to make the Photographs available for public distribution and display without license and without authorization by Gaffney after the expiration of the 2011 Agreement.

**I.    Actual Damages — Market Rates**

Actual damages are determined in part by the fee that a willing seller would have reasonably required a willing buyer to pay at the time of the infringement. In the photography marketplace, each licensor sets his/her own fees, based upon criteria defining the scope of a license.

I requested that Gaffney provide an accounting of the usages discovered to date. Gaffney provided an accounting, "Table of Usages" attached as Exhibit F. Where data for one or more criteria were not disclosed by Defendants, it is my understanding that Gaffney, in populating the Table of Usages (Exhibit F), made the best approximation possible under the circumstances. Gaffney's Notes to Table of Usages entries are attached as Exhibit I.

I calculated fees based on the information available to me, including some or all of these factors: the media in which each of the Photographs was reproduced, circulation, size, placement, versions, territory, and period of use.

In addition to the license fee computations performed by obtaining reference fee quotes reasonably matching the alleged unauthorized usages to the greatest extent possible, I have relied on my personal knowledge and experience in image licensing and in the development and management of industry standards for image licensing. There is no punitive measure to my calculations.

Based on the information available to me as of this writing, and based on my personal knowledge, experience, and a review of the documents, materials, and testimony in the Matters, reasonable actual damages, if applicable, would be as follows:

**Actual Damages by Media Category**

| Media Category | Actual Damages |
|---|---:|
| Digital Media - Social Media | $90,240 |
| Retail, product and packaging - Prints and Posters | $235,998.67 |
| Retail, product and packaging - Apparel | $36,426.67 |
| **Actual Damages** | $362,665.00 |

The total amount, $362,665 is the fair market value of licenses of the Photographs for the alleged unauthorized usages by Defendants, without consideration of the scarcity of comparable photographs, and without consideration of competitive use of the Photographs by Defendants. For a detailed accounting of the calculations supporting this total, see Exhibit L and the additional supporting exhibits listed below.

An explanation of the tables documenting the calculation of damages is attached as Exhibit M.

**J.      Actual Damages Multiplier for Scarcity**

The actual damages estimated above do not contemplate the scarcity of the Photographs. Scarce images typically demand significantly greater license fees than common images, often 3 to 5 times the fee for a common image. Application of a multiplier is necessary and appropriate to adjust the average market rate for a common photograph to a fee applicable to a license for a rare or scarce photograph. The application of a scarcity multiplier is not a punitive measure. The scarcity multiplier serves only to adjust the fair market value of common photographs to the value of a relatively scarce photograph.

Gaffney's photographs of Ali provide a unique perspective on an important period in Ali's life and career. See Exhibit N for details. Given the unique qualities and subject matter of the Photographs, the Court should consider the application of a non-punitive scarcity multiplier in the range of 3x to 5x, to adjust the fair market value of a common Ali photograph to that of the Photographs.

**K.      Actual Damages Multiplier for Competitive Use**

The above calculations do not contemplate a scenario in which an image licensor is approached by a direct competitor seeking to purchase licenses to make competing use of the licensor's photographs. Under such a scenario the image licensor would reasonably expect to require and receive a substantially greater fee than would be required of a non-competitor, and the competitor would reasonably expect to pay such a substantially greater fee.

Based on my knowledge and experience, a licensor would reasonably require a competitor to pay a license fee that is 5 to 10 times greater than market rates otherwise available to a non-competing licensee.

**L.      Actual Damages for Contributory and Vicarious Infringement**

Defendants made the Photographs available to its customers for further reproduction, distribution, and display. Defendants had knowledge of the infringing activity and induced, caused, and materially contributed to the infringing conduct of its customers. Defendants failed to employ sufficient measures to ensure that the recipients of the Photographs were aware of the conditions and restrictions of use. Should the Court determine that third parties infringed on Gaffney's copyrights after receiving the Photographs from Defendants, Defendants should be liable for damages for contributory infringement.

Defendants had both the right and ability to control and supervise the exploitation of the Photographs by Defendant's affiliates and customers, and yet failed to do so. Defendants had both a direct and indirect financial interest in the unauthorized use of the Photographs, in that all such use promoted Defendants brand, facilitated the sale of Defendants' products, and produced additional revenue both to unauthorized third parties and to Defendants themselves. Should the Court determine that third parties infringed on Gaffney's copyrights after receiving the Photographs from Defendants, Defendants should be liable for damages for vicarious infringement.

**M.      The Damaging Viral Effect of Defendants' Unlicensed Use of Gaffney's Photographs**

Defendant's unauthorized use of the Photographs induced, enabled and facilitated further distribution and unauthorized use of the Photographs by third parties, in turn inducing others to make unauthorized use and distribution of the Photographs, causing Gaffney to lose control over his exclusive rights in the Photographs.

**N.**    **Defendants Acknowledged Gaffney's Copyright Ownership**

In the 2011 Agreement, Defendants' acknowledged that Gaffney owned copyright in Gaffney's photographs and promised that Defendants would not challenge Gaffney's copyrights.  Defendant's behavior in requesting, negotiating, and purchasing limited rights from Gaffney is consistent with a belief by Defendants that Gaffney owned a valid copyright in each of the Photographs. The agreements, transactions, communications and other interactions between Defendants and Gaffney demonstrate and clearly establish that representatives of Defendants were aware of and acknowledged Gaffney's copyright ownership in the Photographs, and that Defendants understood that Defendants enjoyed only a limited copyright license, granted to Defendants by Gaffney as the sole copyright owner in the Photographs.

**O.**    **Defendants' Knowledge, Intent and Willfulness**

Defendants are sophisticated media companies. Defendants had the ability to cease reproduction, distribution, display, and the creation of derivatives of any of the Photographs at any time. This did not occur on termination of the 2011 Agreement.

Defendants could have taken necessary steps to prohibit the public display, public distribution, reproduction, and creation of derivatives of each of the Photographs upon expiration of the license period applicable to each Photograph. By publicly displaying and distributing reproductions of the Photographs after the expiration of the 2011 Agreement, and by failing to take necessary action to prohibit same, Defendants evinced willful blindness and/or acted with reckless disregard for Gaffney's copyrights, knowingly and willfully exploiting Gaffney's copyrights without license and without authorization from Gaffney. Defendants had ready means to ensure Defendants' compliance with copyright law, and to avoid and prohibit

unlicensed use of Gaffney's copyrighted works. Despite its capability to do so, Defendants failed to implement protective and remedial measures.

**P.      Statutory Damages**

Where Gaffney holds a timely copyright registration in one or more of the Photographs, Gaffney is entitled to Statutory Damages for willful copyright infringement, in the range of $30,000 to $150,000 per work infringed. Defendants' knowing, extensive, unauthorized exploitation of Gaffney's copyrights justifies the maximum Statutory Damages awards available to Gaffney.

**Q.      Profits**

Retaining counsel has advised that Defendants' have yet to produce sufficient documentation to support a determination of attributable profits. Retaining Counsel has advised that I may be called upon to opine in a Supplemental Expert Report on the causal nexus for disgorgement of Defendants' profits attributable to Defendants' infringement of the Photographs.

**R.      Defendants Did Not Satisfy the Attribution Requirement of the 2011 Agreement**

Based on my review of the testimony, documents and materials produced in this matter, Defendants routinely omitted attribution in connection with Defendants' use and distribution of the Photographs, even where providing such attribution was reasonable, possible, practical, and could have been easily accomplished by Defendants. By omitting Gaffney's attribution, Defendants failed to comply with a requirement of the license Gaffney had granted to Defendants under the 2011 Agreement.

**S.        Defendants' Failure to Provide Attribution Harmed Gaffney**

Based on my knowledge and experience, and with a reasonable degree of
professional certainty, the primary purpose of a credit line requirement in a
photography license is to ensure that the photographer and/or copyright
owner is identified in or on any reproduction/s or derivative/s of the licensed
photograph, so as to permit the copyright owner and its agents to develop
opportunities for additional licenses in derivative markets. Like most
photographers Gaffney's business model depends in part on photo credit,
which serves as an advertising beacon to drive customers to Gaffney's
website and ultimately, to promote the sale and licensing of Gaffney's
photography. When Defendants failed to provide the attribution required
under the 2011 Agreement, Defendants' harmed Gaffney by depriving
Gaffney of business opportunities, and by frustrating Gaffney's efforts to
ensure that potential customers are able to identify and contact Gaffney.

## VII. RIGHT TO SUPPLEMENT

I understand that Defendants may offer expert testimony to support Defendants'
claims in the Matter, and I expect that additional information and documents may
come to light subsequent to my submission of the Report. If requested by Gaffney,
I may offer supplemental reports and/or rebuttal testimony to the opinions
expressed by Defendants and Defendants' experts, in accordance with the Court's
scheduling order.

Respectfully Submitted,

_____    June 30, 2021
Professor Jeffrey Sedlik