# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL GAFFNEY,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>MUHAMMAD ALI ENTERPRISES LLC, a New York Limited Liability Company; AUTHENTIC BRANDS GROUP LLC, a New York Limited Liability Company; ROOTS OF, INC., a California corporation d/b/a "ROOTS OF FIGHT;" and DOES 1-10,<br><br>　　　　　　　　　　　Defendants. | Civil Action No. 1:18-CV-08770-GBD-OTW<br><br>Civil Action No. 1:20-CV-07113-GBD-OTW |

**MEMORANDUM OF LAW IN OPPOSITION AND RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 2 REGARDING THE SCARCITY MULTIPLIER**

**<u>TABLE OF CONTENTS</u>**

I.     INTRODUCTION ........................................................................................... 1

II.    FACTUAL BACKGROUND .......................................................................... 1

    A.    Introduction to Michael Gaffney ......................................................... 1

    B.    The Demand and Scarcity of Gaffney's Photographs of "The Greatest" ............... 2

    C.    Professor Jeffrey Sedlik's Experience and Qualifications ...................................... 4

    D.    Professor Sedlik's Methodology in this Case ....................................................... 5

III.    ARGUMENT .................................................................................................. 7

    A.    The Scarcity Multiplier Has Been Endorsed by Numerous Courts. ...................... 7

    B.    Defendants' Complaints Regarding the Scarcity Multiplier are Meritless. .......... 11

        1.    Defendants Fail to Show Any Need to "Define" Scarcity, and Sedlik's Explanation of Scarcity is Logical and Consistent. ................................... 11

        2.    Contrary to Defendants' Hyperbole, the 3x-5x Range is Not "Pulled From Thin Air." ................................................................................... 14

        3.    Sedlik Was Not Required to Independently Verify Scarcity, and Scarcity is Already Demonstrated by the Evidence. ................................. 16

IV.    CONCLUSION ............................................................................................ 17

## <u>TABLE OF AUTHORITIES</u>

Page

*Affordable Aerial Photography, Inc. v. Elegance Transportation, Inc.*,
No. 6:21-CV-1166-CEM-LHP, 2022 WL 2306182 (M.D. Fla. Feb. 23, 2022) .................. 8

*Allegra v. Luxottica Retail N. Am.*,
341 F.R.D. 373 (E.D.N.Y. 2022) .................................................................. 13

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ............................................................................ 16

*Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*,
No. CV SAG-18-03384, 2021 WL 5359671 (D. Md. Nov. 17, 2021)......................... 10, 11

*Brittney Gobble Photography, LLC v. Wenn Ltd.*,
No. 3:16-CV-306-HSM-DCP, 2019 WL 2446997 (E.D. Tenn. Feb. 19, 2019),
*report and recommendation adopted sub nom.*
*Brittney Gobble Photography, LLC v. USA Ent. News, Inc.*,
No. 3:16-CV-306, 2019 WL 1125644 (E.D. Tenn. Mar. 12, 2019)............................... 8, 10

*Corson v. Gregory Charles Interiors, LLC*,
No. 9:19-CV-81445, 2020 WL 6323863 (S.D. Fla. Aug. 7, 2020).................................... 8

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .................................................................................... 9

*D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*,
No. 17-CV-747-LM, 2020 WL 60351 (D.N.H. Jan. 6, 2020)........................................ 8, 9

*Ermert v. Boca Dental Supply, LLC*,
No. 18-81666-CV, 2019 WL 7837289 (S.D. Fla. Mar. 29, 2019) ...................................... 9

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
638 F. Supp. 3d 227 (E.D.N.Y. 2022)................................................................. 16

*Joffe v. King & Spalding LLP*,
No. 17-CV-3392 (VEC), 2019 WL 4673554 (S.D.N.Y. Sept. 24, 2019) .......................... 15

*Lakah v. UBS AG*,
No. 07-CV-2799 (LAP), 2016 WL 10839568 (S.D.N.Y. Jan. 20, 2016) .......................... 13

*Leonard v. Stemtech Int'l Inc.*,
834 F.3d 376 (3d Cir. 2016) ...................................................................... 7, 8, 9

*Lifchits v. Key 4U Transportation Corp. Bus.*,
    No. 20-CV-03749-JRC, 2023 WL 6201862 (E.D.N.Y. Sept. 22, 2023) ........................... 17

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003),
    *aff'd*, 99 F. App'x 274 (2d Cir. 2004) .................................................................................. 15

*McCullock v. H.B. Fuller Co.*,
    61 F.3d 1038 (2d Cir. 1995) ................................................................................................ 15

*Noel v. City of New York*,
    No. 15 CV 5236-LTS, 2023 WL 3170430 (S.D.N.Y. Apr. 28, 2023) ............................... 15

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*,
    988 F. Supp. 2d 395 (S.D.N.Y. 2013) ................................................................................. 15

*Reiffer v. Active Certification Servs. LLC*,
    No. 1:21-CV-20177, 2021 WL 5772166 (S.D. Fla. Nov. 8, 2021) ....................................... 9

*SEC v. Yorkville Advisors, LLC*,
    305 F. Supp. 3d 486 (S.D.N.Y. 2018) ................................................................................. 16

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*,
    467 F.3d 107 (2d Cir. 2006) .......................................................................................... 13, 14

*Tyler v. Bethlehem Steel Corp.*,
    958 F.2d 1176 (2d Cir. 1992) .............................................................................................. 16

*Volino v. Progressive Cas. Ins. Co.*,
    No. 21 CIV. 6243 (LGS), 2023 WL 2532836 (S.D.N.Y. Mar. 16, 2023) ........................... 15

iii

## I.      INTRODUCTION

Plaintiff Michael Gaffney ("Gaffney") respectfully submits this memorandum in opposition and response to Defendants' Motion *In Limine* No. 2 (ECF 101) (the "Motion") to exclude the expert testimony of Professor Jeffrey Sedlik relating to the concept of a scarcity multiplier. Defendants' motion flies in the face of numerous caselaw using a scarcity multiplier to calculate fair market value. Defendants' motion should be denied.

## II.     FACTUAL BACKGROUND

### A.      Introduction to Michael Gaffney

In August 1977, Michael Gaffney traveled to Muhammad Ali's boxing camp in Pennsylvania, in an attempt to photograph the then-heavyweight champion. (ECF 133, ¶ 2.) At the time, Gaffney was working as a newspaper photographer. (*Id.*, ¶ 7.) Ali was already one of the most famous people in the world, having fought George Foreman, Joe Frazier, and Sonny Liston, among numerous others. (*Id.*, ¶ 3.) Gaffney had no appointment to meet Ali and didn't even know if he would make it into the camp. (*Id.*, ¶ 4.) Gaffney was able to obtain access to Ali's camp and began photographing him. (*Id.*, ¶ 5.) Gaffney particularly impressed Ali by joining him on a pre-dawn training run up a mountain outside of the camp. (*Id.*, ¶ 6.) After a few days, Gaffney told Ali that he planned to leave soon, to get back to his family and his job. (*Id.*, ¶ 7.) As it turned out, Ali's longtime photographer was resigning to run for Congress. (*Id.*, ¶ 8.) Thus, Ali invited Gaffney to join him as his personal photographer. (*Id.*, ¶ 9.)

Over the next year or so, Gaffney had unparalleled and intimate access to Ali, the greatest boxer of all time and one of the most consequential figures of the 20th Century. During that time, Gaffney took over 8,000 photographs of Ali. (*Id.*, ¶ 11.) Gaffney captured not only critical moments in Ali's storied boxing career, including fights with Earnie Shavers and Leon Spinks, but also private moments where very few others were present, including when Ali was training

or spending time with family and friends. (*Id.*, ¶¶ 10-11.) During that time, no other photographer had the level of behind-the-scenes access that Gaffney enjoyed with Ali.

**B.     The Demand and Scarcity of Gaffney's Photographs of "The Greatest"**

As a result of Gaffney's special access to Ali, Gaffney's photographs are valuable and highly sought after. The photographs have been featured on ESPN and in exhibitions at around the world, including at the Morris Museum in New Jersey, the London Olympics, the San Francisco Art Exchange, and The Harlem Fine Arts Show. (ECF 58, ¶ 19.) Gaffney published many of the photographs in 2012 in a documentary book entitled *The Champ-My Year With Muhammad Ali*. (ECF 140, ¶¶ 37, 39.) These photographs are so valuable and iconic that Defendants selected one of them (Ali-008) as the official obituary image for Ali for three straight years (2016 to 2018). (Preliminary Expert Report of Professor Jeffrey Sedlik ["Sedlik Report"], Ex. N at 8 (Linger Decl., Ex. 5).)

The scarcity of Gaffney's photographs is well supported by the evidence of record:

- **Sedlik Testimony:** "[B]ecause there were no other photographers present for the vast majority of the images in question, there aren't comparable images available for licensing. If somebody wants to get an image of Ali training on the beach, there is only one place to go, and that is Mr. Gaffney." (Transcript of August 12, 2021 Deposition of Jeffrey Sedlik ["Sedlik Tr."], 206:15-21 (Linger Decl., Ex. 6).)

- **Sedlik Report:** "Gaffney's photographs of Ali provide a unique perspective on an important period in Ali's life and career. See Ex. N for details. Given the unique qualities and subject matter of the Photographs, the Court should consider the application of a non-punitive scarcity multiplier in the range of 3x to 5x ...." (Ex. 1 (Sedlik Report) at 19.)

2

- **Ali-001:** "I [Gaffney] was the only photographer there at the gym to capture this solemn image of Ali, at 36 years old [Ali] was facing the difficult training and sparring needed to win back the title." (Ex. 5 (Ex. N) at 21.)

- **Ali-002:** "in fact, to my knowledge it is the only photo of Ali ever running on the beach and extremely rare."[1] (*Id.* at 2.)

- **Ali-008:** "This photograph of Ali is unique for his relaxed smile despite the pressure minutes before the Earnie Shavers fight. There were other photographers in the pre-fight locker room, however, the photographers were cleared out and only a TV film crew was there when I captured this image." (*Id.* at 4.)

- **Ali-010:** "This image of Ali is not entirely unique but rare because the photographers were ordered out of the locker room for a TV interview. The access to Ali being the only still photographer there allowed me to make the photo …." (*Id.* at 5.)

- **Ali-016:** "There were no other photographers around when I made this photo at Ali's Deer Lake Camp." (*Id.* at 7.)

- **Ali-017:** "This photograph of Ali taping his hands is unique. No other photographer made this same photograph." (*Id.* at 8.)

- **Ali-029:** "There were press photographers there but none were permitted to accompany Ali as he made personal visits with the children." (*Id.* at 10.)

- **Ali-045:** "It's a unique photograph because I was the only photographer travelling with Ali in the limo or on the street to capture this rare moment in the streets of

---

[1] At his deposition, Defendants' expert, Brian Buss, admitted that this statement "could make [the photograph], as you'd say a unique photograph." Buss further testified that "some photographs" are "more unique in subject matter" or "different enough from other photographs to be considered different unique." (Transcript of August 9, 2021 Deposition of Brian Buss ["Buss Tr."], 132:19-20 (Linger Decl., Ex. 8).)

Detroit." (*Id.* at 13.)

- **Ali-102:** "This is one of those rare times I was alone with the Champ in Madison Square Garden, as he worked on his hand and foot speed hours before the Earnie Shavers fight." (*Id.* at 19.)

- **Ali-109:** "This photograph is unique because I was alone with Muhammad for this early morning run at his Deer Lake Boxing Camp." (*Id.* at 20.)

- **Ali-004:** "[T]his photograph … is rare for its location at Angelo Dundees … the original gym where Ali's career began and ended three decades later." (*Id.* at 22.)

- **Ali-005:** "I was the only photographer to make this photo at this time in the fight from the catwalk …." (*Id.* at 23.)

### C.    Professor Jeffrey Sedlik's Experience and Qualifications

Defendants do not challenge whether Professor Sedlik is qualified to offer an expert opinion in this case. And for good reason, as he is eminently qualified to do so.

Professor Sedlik has 25 years of experience working in the photography, advertising, product marketing, technology, and design industries. Currently, Sedlik serves as the president and CEO of the PLUS Coalition, a standards-setting body for the design, advertising, and publishing worlds. He has served as a professor at the Art Center College in Pasadena, California for 20 years and teaches courses on copyright design, business practices, and photography. Since 1986, Sedlik has served as the President of Sedlik Productions/Sedlik Design, a commercial photography, design, and film production company. He is the former President of the Advertising Photographers of America ("APA"), a leading trade association for commercial photographers and videographers. He has represented the APA in discussions with the U.S.

Copyright Office and worked with organizations around the world to develop and maintain licensing standards.

### D.      Professor Sedlik's Methodology in this Case

To determine actual damages for the infringed photographs, Professor Sedlik applied the same general methodology that he has used and been accepted in other copyright cases.

Professor Sedlik calculated "the fee that a willing seller would have reasonably required a willing buyer to pay at the time of the infringement." (Ex. 1 (Sedlik Report) at 17.) To do so, he obtained license fee quotes from four licensing agencies—the Associated Press, Getty, Magnum Photos, and Redux Pictures. (*Id.* at 18; Ex. 2 (Ex. J).) Sedlik sent each agency a generic image of Muhammad Ali. (*Id.* at 1, 6, 9, 10.) In selecting the photograph, Sedlik carefully selected a non-scarce or generic image where "multiple competing images" were also available. (Ex. 6 (Sedlik Tr.), 223:24-224:3, 224:9-13.) Sedlik requested quotes in three media categories: social media, prints/posters, and apparel. (Ex. 2 (Ex. J) at 1, 6, 9, 10.) Sedlik then averaged the quotes to calculate an average market rate, per year, for each of the three media categories. (Ex. 3 (Ex. K).) He applied the average market rate to each of Defendants' infringing uses, selecting the appropriate rate for each use, based on whether the photograph was used in social media, prints/posters, or apparel. (Ex. 4 (Ex. L).) Because the quotes he received were for just one-year of use, and some of the infringement occurred over the span of multiple years, Sedlik applied multiple "license units" for certain photographs. (*Id.* at 3.) He then summed all of the license fees, across the various uses, to arrive at an actual damages base of $362,665. (Ex. 1 (Sedlik Report) at 18.)

Because Sedlik obtained quotes for generic photographs of Ali, of which there were numerous competing images, the $362,665 base figure does not take into account the scarcity of Gaffney's photographs. Sedlik stated in his report that "[s]care images typically demand

significantly greater license fees than common images, often 3 to 5 times the fee for a common image." (*Id.* at 19.) The scarcity multiplier "is necessary and appropriate to adjust the average market rate for a common photograph to a fee applicable to a license for a rare or scarce photograph." (*Id.*)

Sedlik did not independently validate the scarcity of the photographs, and instead, relied on the existing evidence of record, including Gaffney's statements from Ex. N cited above. (Ex. 6 (Sedlik Tr.), 207:5-9 ("I was not called in to validate the scarcity of each and every image, and we have … a non-sworn narrative about that scarcity with the stories behind the image …").) Sedlik testified that, if the jury should determine that the photographs are indeed scarce based on this evidence, then the jury should apply a 3x to 5x multiplier "based on [Sedlik's] experience in licensing scarce images." (*Id.*, 207:21-208:5, 221:2-8 ("if the images are found to be rare, that should be applied").)

The scarcity multiplier makes straightforward economic sense. As Sedlik explained at his deposition, "if they're doing a documentary on Muhammad Ali and … they want to … have coverage of or talk about a certain time in his life before a fight and how he prepared and they need an image, and you've got the only image, then that image has more value than an image where there's 100 photographers standing around Ali …" (*Id.*, 211:10-17; 215:1-4 ("You can't recreate Ali running down the beach. You can't recreate James Dean on his motorcycle or Marlon Brando in his jeans. You just can't do it, and so those images are scarce.").) In contrast, for a photograph like a handshake or a cat where there are thousands or millions of similar images, "that drives the price down." (*Id.*, 211:1-9, 212:21-22.)

This uncontroversial concept – that a scarce good commands a higher price – applies to all manner of assets. As Sedlik testified, "If I have a very rare Porsche, I'm going to charge more

for it ….." (*Id.*, 217:19-21.) Even Defendants' rebuttal expert, Brian Buss, agrees: "There is definitely a concept in asset valuation where a scarce or unique asset may be able to command a higher transaction price, than a asset that has more equivalent or substitute assets." (Ex. 8 (Buss Tr.), 133:21-24.)

Sedlik repeatedly explained that the scarcity multiplier ranges from 3x to 5x due to his experience in the industry. "The three to five multiplier comes out of discussions with licensors … and stock agents about how much more they charge for rare or scarce images." (Ex. 6 (Sedlik Tr.), 218:18-25.) "The range of three to five is based on real-world experience in licensing." (*Id.*, 220:2-4.) "A licensor in pricing a scarce image will typically come in with a price that is at least three to five teams more than they would have asked if their image was not scarce. And I provide a range because … there's no method for pinning down a precise multiplier." (*Id.*, 220:10-15.)

In sum, Sedlik's methodology regarding the scarcity multiplier is sound, consistent with basic economic principles, and grounded in his years of experience in the licensing field.

## III.   ARGUMENT

### A.   The Scarcity Multiplier Has Been Endorsed by Numerous Courts.

Courts routinely allow parties to use a scarcity multiplier to arrive at the fair market value of copyrighted photographs. The Third Circuit held, in a case involving Professor Sedlik, that the plaintiff could use a scarcity multiplier "to account for the 'scarcity or rarity' of" a photograph depicting a human stem cell. *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 385 (3d Cir. 2016). The scarcity multiplier in *Leonard* matches exactly the scarcity multiplier used by Professor Sedlik here: 3x-5x. *Id.* The Third Circuit determined that a scarcity multiplier was appropriate because there were very few, similar images available, and the fair market value was not "complete" until "these additional factors were applied." *Id.*, 382, 393. The Court reasoned that a scarcity multiplier "reflected a premium that … the market would find acceptable." *Id.* The Court

affirmed the jury's verdict of $1.6 million, which incorporated the scarcity multiplier, even though the photographer had recently licensed the same photographs for as low as $*100*. *Id.*, 383.

The District of New Hampshire also permitted Professor Sedlik to use a scarcity multiplier of 3x-5x to calculate the fair market value of a photograph showing a unique arrangement of guitars. *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, No. 17-CV-747-LM, 2020 WL 60351, at *7 (D.N.H. Jan. 6, 2020). The Court denied the defendant's motion *in limine* on this issue, crediting Sedlik's testimony that the multiplier reflected a "premium" that "the market would find acceptable" given that that there "few if any similar" photographs available. *Id.*, *6-8. The Court cited various other court decisions, including *Leonard* (discussed above), allowing Sedlik to testify about a scarcity multiplier, and found that the defendant could challenge Sedlik's methodology on cross-examination. The Eastern District of Tennessee also reached a similar conclusion, using a 3x scarcity multiplier based on Professor Sedlik's expert opinions. *Brittney Gobble Photography, LLC v. Wenn Ltd.*, No. 3:16-CV-306-HSM-DCP, 2019 WL 2446997, at *8 (E.D. Tenn. Feb. 19, 2019), *report and recommendation adopted sub nom. Brittney Gobble Photography, LLC v. USA Ent. News, Inc.*, No. 3:16-CV-306, 2019 WL 1125644 (E.D. Tenn. Mar. 12, 2019).

Nor is Professor Sedlik alone in using a scarcity multiplier to calculate fair market value. Other courts, in cases not involving Professor Sedlik, have used a scarcity multiplier in copyright cases in the 3x-5x range. *Corson v. Gregory Charles Interiors, LLC*, No. 9:19-CV-81445, 2020 WL 6323863, at *2 (S.D. Fla. Aug. 7, 2020) ("The Court finds Corson's request for a scarcity multiplier of four is appropriate to reflect the fair market value of Corson's Work."); *Affordable Aerial Photography, Inc. v. Elegance Transportation, Inc.*, No. 6:21-CV-1166-CEM-LHP, 2022 WL 2306182, at *7 (M.D. Fla. Feb. 23, 2022) (applying a scarcity multiplier of 5x); *Reiffer v.*

8

*Active Certification Servs. LLC*, No. 1:21-CV-20177, 2021 WL 5772166, at *2 (S.D. Fla. Nov. 8, 2021) (applying a scarcity multiplier of 5x); *Ermert v. Boca Dental Supply, LLC*, No. 18-81666-CV, 2019 WL 7837289, at *3 (S.D. Fla. Mar. 29, 2019) (applying a scarcity multiplier of 5x).

Based on this authority, Professor Sedlik should be permitted to testify at trial about the scarcity multiplier. Defendants acknowledge this overwhelming authority in their motion, but suggest that it should be discounted because some of the cases arose in the context of a default judgment, rather than a motion *in limine*. (Motion, 11-12, n.4.) However, *Leonard* involved a motion for a new trial, and *D'Pergo* involved a motion *in limine*. Moreover, even in the default judgment context, if a scarcity multiplier may be used by a judge to make an *actual* monetary award, it should be allowed to be *presented* to a jury for their *consideration*, given that Defendants will still have the opportunity to challenge it via cross-examination. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Defendants attempt to distinguish *Leonard*, arguing that the photographs there "required rare technical skills" and the defendants admitted the images were "extremely valuable," but here, "there are innumerable photographs of Muhammad Ali." (Motion, 11.) Sedlik was queried about this exact issue during deposition, and he testified that, just because a person is famous, or has been photographed "millions" of times, does not mean that every image of that person is generic or worthless. (Ex. 6 (Sedlik Tr.), 212:23-213:14.) Rather, there are certain images that capture "unique or important moments" when "nobody else was there shooting." (*Id.*, 204:22-205:2, 215:1-2 ("You can't recreate Ali running down the beach.").) Sedlik should likewise be entitled to explain this to the jury. Gaffney was Ali's personal photographer, and he enjoyed

9

unparalleled, behind-the-scenes access that no other photographer had. Indeed, for many of the

images, as detailed above, Gaffney was the **only** photographer present at the time. (*E.g.*, Ex. 5

(Ex. N) at 21 ("I [Gaffney] was the only photographer there at the gym"); 2 ("in fact, to my

knowledge it is the only photo of Ali ever running on the beach and extremely rare.").) Sedlik

provided other examples of images capturing famous people (e.g., Marilyn Monroe, James Dean,

Marlon Brando) that Sedlik himself has successfully licensed to others based on the principle of

scarcity. (Ex. 6 (Sedlik Tr.), 208:1-5, 213:3-9 ("I have images of very famous people that

demand a higher fee, and I license these images … of Marilyn Monroe and James Dean, and

nobody else was around and one photographer has the images, so I can name the price …"),

215:2-3 ("You can't recreate James Dean on his motorcycle or Marlon Brando in his jeans. …

[T]hose images are scarce.").) Defendants acknowledged the value of the Gaffney photographs

by choosing one of them as the official obituary photograph of Ali for three straight years. (Ex. 5

(Ex. N) at 8.)

Defendants cite *Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, No. CV

SAG-18-03384, 2021 WL 5359671 (D. Md. Nov. 17, 2021),[2] in which the court excluded Sedlik

from testifying about a scarcity multiplier. However, *Gobble* is an outlier, as most cases permit

the use of a scarcity multiplier to calculate fair market value. *Gobble* is also distinguishable in

several important ways. First, *Gobble* involved photographs of an arcane breed of cat, and the

court found that Sedlik failed to show any evidence of demand for these kind of photographs

over photograph showing other types of breeds. *Id.*, *7. Here, there is evidence of strong demand

for photographs of Muhammad Ali, the greatest heavyweight boxer of all-time, especially during

---

[2] This case should not be confused with *Brittney Gobble v. Wenn* (discussed previously), from
the Eastern District of Tennessee, in which the Court applied a scarcity multiplier to calculate
fair market value of a photograph.

the period of Ali's career when Gaffney was his personal photographer. (Sedlik Report, Ex. N; Sedlik Tr., 213:2-5, 213:10-14; Transcript of November 20, 2020 Deposition of Michael Gaffney ["Gaffney Tr."], 146:16-20 (discussing the "tremendous" popularity of Ali).) Second, in *Gobble*, Sedlik cited evidence for scarcity that he obtained *after* he wrote his report, so the Court reasoned that "it could not have supported the conclusions he reached in his initial report." *Gobble*, 2021 WL 5359671, *8. Here, Sedlik's report fully sets forth the bases for his opinions, and no evidence was obtained after the report.

**B.    Defendants' Complaints Regarding the Scarcity Multiplier are Meritless.**

Notwithstanding the authority discussed above, Defendants argue that Professor Sedlik's opinions regarding the scarcity multiplier are "inadmissible" because: (1) Sedlik did not "define" "scarcity"; (2) the 3x-5x range for the scarcity multiplier "is pulled from thin air"; and (3) Sedlik did not "independently verif[y]" the scarcity of each photograph. (Motion, 7-11.) Each of Defendants' complaints are legally meritless and ignore important evidence of record, including Sedlik's actual testimony.

**1.    Defendants Fail to Show Any Need to "Define" Scarcity, and Sedlik's Explanation of Scarcity is Logical and Consistent.**

Defendants argue that Sedlik's report "does not define scarcity," and that he has failed "to offer a consistent definition" of scarcity. (Motion, 7-8.) Defendants are wrong on both accounts. "Scarcity" is a commonly-used term that can be understood by the jury, without a precise definition from an expert. Sedlik has consistently explained the concept of scarcity, just as he has in other cases. At his deposition, Sedlik explained scarcity in various ways, but his explanations were perfectly consistent with one another. Defendants do not show any actual contradiction in his testimony.

2370544.1

Sedlik's report explains that the photographs "provide a unique perspective on an important period in Ali's life and career" and that the photographs offer "unique qualities and subject matter." (Ex. 1 (Sedlik Report) at 19.) His report also cites Ex. N, a narrative written by Gaffney explaining the context and meaning behind the photographs. For many of these photographs, as described in Ex. N and in Section II.B above, Gaffney was alone with Ali or the only photographer in the room. (*See, e.g.*, Ex. 5 (Ex. N) at 21 ("I was the only photographer there at the gym to capture this solemn image of Ali"), 2 ("in fact, to my knowledge it is the only photo of Ali ever running on the beach and extremely rare"), 2 ("The access to Ali being the only still photographer there allowed me to make the photo"), 5 ("There were no other photographers around"), 19 ("I was alone with the Champ").) Accordingly, there are very few, if any, comparable images of Ali involving the same subject matter. (Ex. 6 (Sedlik Tr.), 211:10-21 ("if they're doing a documentary on Muhammad Ali and they want to … talk about a certain time in his life before a fight and how he prepared and .. you've got the only image, then that image has more value"), 215:1-2 ("You can't recreate Ali running down the beach.").) The photographs, therefore, are scarce.

At his deposition, Sedlik consistently explained the concept of scarcity. (*Id.*, 208:22-24 ("relative lack of supply of … a photograph"), 210:5-7 ("an image for which there are not many copies, many competing images available, would be a scarce image"), 214:9-22 ("relatively few competing images of the same subject matter").) Defendants' cherry-picked quotes do not suggest otherwise. The first quote cited by Defendants states that "scarcity would be a relative lack of supply of an asset." (*Id.*, 208:22-23.) This is perfectly consistent with Sedlik's testimony. As Sedlik further explained, if you search for a "cat" on Getty Images, "you'll get 100,000 results or more." (*Id.*, 208:25-209:1.) However, "[i]f you search 'Muhammad Ali jogging on the

beach,' you'll get no results.'" (*Id.*, 209:1-3.)[3] Defendants then cite Sedlik's statement that

scarcity can fall on a "continuum," but this just means that some images may be scarcer or rarer

than others. Defendants omit the remainder of Sedlik's testimony in which he explains that "an

image for which there are not many copies, many competing images available, would be a scarce

image." (*Id.*, 210:5-7.) Defendants then claim that Sedlik testified that scarcity is defined as

"viability in the marketplace." That is a misquote. Sedlik testified that a scarce image may have

"viability in the marketplace" because "there's no other photographers around" for certain

images, then "you've got the only image," and "that image has more value" and "viability" than

a common image with thousands of similar results. (*Id.*, 211:15-18.) Sedlik explained that if you

"can't recreate" an image like "Ali running down the beach" then "that adds a measure of

scarcity." (*Id.*, 214:21-215:2.) All of this is consistent and makes logical sense.

Defendants argue that his methodology is flawed because it does not consider "the

demand for the photographs," suggesting that Gaffney's photographs were somehow in low

demand. (Motion, 8.) First, any gaps in the expert's opinions go to weight, not admissibility, and

can be explored on cross-examination. *Lakah v. UBS AG*, No. 07-CV-2799 (LAP), 2016 WL

10839568, at *2 (S.D.N.Y. Jan. 20, 2016) (denying motion to preclude expert) (citing *SR Int'l*

*Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 134 (2d Cir. 2006) (noting if

there "are gaps in the expert's testimony, those issues go to the weight of the evidence, not to its

admissibility.")); *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 455 (E.D.N.Y. 2022)

("failing to consider certain variables or attributes" in a model "go to the weight and not

---

[3] This is confirmed by running a search on Getty Images.
https://www.gettyimages.com/search/2/image-
film?family=creative&phrase=muhammad%20ali%20%20jogging%20on%20the%20beach&sor
t=mostpopular.

admissibility of the model"). Second, the scarcity multiplier is not directly tied to demand, and thus, does not require its consideration. (Ex. 6 (Sedlik Tr.), 220:10-15 ("A licensor in pricing a scarce image will typically come in with a price that is at least three to five times more than they would have asked if their image was not scarce.").) Third, there is evidence of strong demand for Gaffney's photographs of Muhammad Ali. As Sedlik testified, Ali is "one of the most famous people around" and "images of very famous people … demand a higher fee." (*Id.*, 213:2-5, 213:10-14.) Gaffney covered Ali during some of his most famous fights, including fights against Earnie Shavers and Leon Spinks. (Ex. 5 (Ex. N) at 1.) Sedlik testified that a documentarian, for example, would need to select an image from this period when discussing this period in Ali's career. (Ex. 6 (Sedlik Tr.), 211:10-21.) Even Defendants selected one of Gaffney's photographs as the official obituary photograph of Ali for three straight years. (Ex. 5 (Ex. N) at 8.)

## 2. Contrary to Defendants' Hyperbole, the 3x-5x Range is Not "Pulled From Thin Air."

A scarcity multiplier of 3x to 5x has been endorsed by numerous Courts and is based on Sedlik's "real-world experience in licensing" photographs. (Ex. 6 (Sedlik Tr.), 220:3-4.) Sedlik has extensive experience in the photography licensing field, authored leading reference materials for photographers who license their works, taught classes on photography licensing, and licensed numerous of his own photographs to licensors. (Ex. 1 (Sedlik Report) at 1-5.) The 3x to 5x range is grounded in Sedlik's personal experience as well as "discussions with licensors … and stock agents about how much more they charge for rare or scarce images." (Ex. 6 (Sedlik Tr.), 207:21-208:5, 218:18-22.)

Professor Sedlik's extensive experience in this area is alone sufficient to pass *Daubert*. *See SR Int'l Business Ins. Co., Ltd. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 132 (2d Cir. 2006) (finding that expert witness sufficiently connected experience to opinions where he

"testified that he had over 30 years of experience in the insurance industry ... and he was familiar with practices in the industry," and that "through these experiences," he was able to identify customary industry practices); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) ("Experience may provide a sufficient foundation for expert testimony."). Survey analysis is not necessary when an expert has experience in the field. *Joffe v. King & Spalding LLP*, No. 17-CV-3392 (VEC), 2019 WL 4673554, at *6 (S.D.N.Y. Sept. 24, 2019) (lack of survey did not preclude testimony, where expert had significant experience and credentials).

Notwithstanding this extensive, lengthy experience, Defendants contend that Sedlik failed to rely on "concrete, documented transactions." (Motion, 9.) Defendants' argument is wrong as a legal matter, as there is no requirement that an expert list specific dates, names, or amounts from decades of experience. *See, e.g.*, *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (attacks regarding an expert's lack of textual support for his opinion, go to the weight, not the admissibility, of the opinion); *Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 405 (S.D.N.Y. 2013) ("Although Allen could have been provided more details on this experience, these statements are sufficient to support the relatively simple proposition he is advancing here."); *Volino v. Progressive Cas. Ins. Co.*, No. 21 CIV. 6243 (LGS), 2023 WL 2532836, at *4 (S.D.N.Y. Mar. 16, 2023) ("That Merritt did not cite specific, documented appraisal standards goes to the weight, not the admissibility of his testimony."); *Noel v. City of New York*, No. 15 CV 5236-LTS, 2023 WL 3170430, at *3 (S.D.N.Y. Apr. 28, 2023) (admitting highly-experienced expert to testify on a topic, despite the fact that he could have "provided more details about the specific experiences he encountered that gave rise to his views").

Defendants are also wrong as a factual matter, as Sedlik *did* provide specific examples at his deposition involving Marilyn Monroe and James Dean: "*[M]yself, I have images of very famous people* that demand a higher fee, and license these images … of Marilyn Monroe and James Dean, and nobody else was around and one photographer has the images, *so I can name the price*, you know, basically." (Ex. 6 (Sedlik Tr.), 213:3-9, 216:16-21.)[4]

Sedlik further testified that he previously validated his long-held opinions by speaking to "five commercial photographers who are actively licensed in their work" and asking them how much more they would charge for a "scarce image versus a non-scarce image." (*Id.*, 223:3-10.) Contrary to Defendants' claim, the survey was not "post hoc," but was conducted by Sedlik "a couple of years" prior to his report. (*Id.*, 288:7.) An expert may reasonably rely on survey evidence when it is consistent with their personal experience. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 286 (E.D.N.Y. 2022).

### 3.   Sedlik Was Not Required to Independently Verify Scarcity, and Scarcity is Already Demonstrated by the Evidence.

Finally, Defendants contend that Professor Sedlik's opinions should be excluded because he did not independently verify the scarcity of each photograph. (Motion, 10.) It is well-established that an expert may rely on other evidence or assumptions provided by counsel. Any contention that an expert's "assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992)). This Court has refused to preclude an expert from testifying about topics based on allegedly improper assumptions. *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 508 (S.D.N.Y. 2018) (Daniels, J.). Sedlik's

---

[4] Defendants acknowledge this very example from Sedlik's experience in the factual background section of their motion.  (Motion, 4.)

2370544.1

opinions do not rest on "subjective belief or unsupported speculation," but other evidence, including statements from the photographer Gaffney. (Ex. N.)  There is no reason to exclude any of this testimony or evidence.  *Lifchits v. Key 4U Transportation Corp. Bus.*, No. 20-CV-03749-JRC, 2023 WL 6201862, at *1 (E.D.N.Y. Sept. 22, 2023) ("[W]here an expert sets forth the basis for his reasoning and relies on evidence that is specifically cited in the record, his proposed testimony will not be rejected as speculative or conclusory.")

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion *in Limine* No. 2 should be denied.

Date: January 12, 2024

Respectfully submitted,

*/s/ Robert E. Allen*
Robert E. Allen (admitted *pro hac vice*)
Lawrence M. Hadley (admitted *pro hac vice*)
Jason C. Linger (admitted *pro hac vice*)
GLASER WEIL FINK HOWARD JORDAN & SHAPIRO LLP
10250 Constellation Blvd., 19th Fl.
Los Angeles, CA 90067
Telephone: (310) 282-6280
rallen@glaserweil.com
lhadley@glaserweil.com
jlinger@glaserweil.com

Jack Spinella
Spinella Law Group, LLC
425 Madison Avenue
New York, New York 10123
Telephone: (908) 947-2336
jspinella@spinellalawgroup.com

*Attorneys for Plaintiff Michael Gaffney*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 12, 2024, a true and correct copy of the foregoing **PLAINTIFF MICHAEL GAFFNEY'S OPPOSITION AND RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 2 REGARDING THE SCARCITY MULTIPLIER** was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Robert E. Allen*
Robert E. Allen

18

2370544.1